# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JASON LEOPOLD and RYAN NOAH SHAPIRO,<br><br>Plaintiffs,<br><br>v.<br><br>CENTRAL INTELLIGENCE AGENCY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>) Civil Action No. 1:16-cv-01833 (KBJ)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT'S COMBINED REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

JOSEPH H. HUNT
Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

AMY E. POWELL
Federal Programs Branch
Civil Division, Department of Justice
310 New Bern Avenue, Suite 800
Federal Building
Raleigh, NC 27601-1461
Phone: 919-856-4013
Email:  amy.powell@usdoj.gov
*Counsel for Defendants*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 1

    I.       CIA Conducted a Reasonable Search ................................................. 1

    II.      CIA Properly Invoked the Deliberative Process Privilege. ................................... 6

    A.  The Declaration and Index Properly Describe the Application of the Privilege. ......... 6

    B.  Talking Points. ...................................................................................................... 10

    C.  Cables..................................................................................................................... 11

    D.  Drafts...................................................................................................................... 13

    E.  Memoranda For the Record. .................................................................................. 14

    F.  OIG Report............................................................................................................. 15

    G.  Other Internal Memoranda..................................................................................... 15

    III.     CIA Properly Invoked the Attorney-Client Privilege ........................................... 22

    IV.    CIA Properly Invoked the Attorney Work Product Doctrine. .............................. 25

    V.      Plaintiffs' "Additional Issues" Are Meritless. ...................................................... 27

CONCLUSION.................................................................................................................... 28

# TABLE OF AUTHORITIES

**CASES**

*\*Abtew v. DHS*,
  808 F.3d 895 (D.C. Cir. 2015) ................................................................... 6

*ACLU v. CIA*,
  823 F.3d 655 (D.C. Cir. 2016),
  *cert denied*, 137 S. Ct. 1837 (2017) ..................................................... 2, 3

*Am. Civil Liberties Union v. Dep't of Def.*,
  No. 15 CIV 9317 (AKH), 2017 WL 4326524 (S.D.N.Y. Sept. 27, 2017) ........................ 11, 12

*Ancient Coin Collectors Guild v. Dep't of State*,
  641 F.3d 504 (D.C. Cir. 2011) ............................................................. 14, 15

*Armstrong v. Exec. Office of the President*,
  90 F.3d 553 (D.C. Cir. 1996) ................................................................ 19

*Assassination Archives & Research Ctr., Inc. v. CIA*,
  720 F. Supp. 217 (D.D.C. 1989),
  *aff'd*, No. 89-5414, 1990 WL 123924 (D.C. Cir. Aug. 13, 1990) ........................... 14

*Bloche v. Dep't of Def.*,
  No. CV 07-2050 (RC), 2019 WL 1428337 (D.D.C. Mar. 29, 2019) ............................ 10, 20

*Cause of Action Institute v. DOJ*,
  330 F. Supp. 3d 336 (D.D.C. 2018) ........................................................... 8

*Coastal States Gas Corp. v. Department of Energy*,
  617 F.2d 854 (D.C. Cir. 1980) .............................................................. 6, 7

*Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*,
  161 F. Supp. 3d 120 (D.D.C. 2016),
  *modified on other grounds*, 185 F. Supp. 3d 26 (D.D.C. 2016) .............................. 21

*De Sousa v. CIA*,
  239 F. Supp. 3d 179 (D.D.C. 2017) .......................................................... 17

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
  532 U.S. 1 (2001) ........................................................................... 8

*DiBacco v. U.S. Army*,
  795 F.3d 178 (D.C. Cir. 2015) ............................................................... 2

*Dudman Commc'ns Corp. v. Dep't of Air Force*,
  815 F.2d 1565 (D.C. Cir. 1987) ............................................................. 21

*Ecological Rights Found. v. Fed. Emergency Mgmt. Agency*,
No. 16-cv-5254 (MEJ), 2017 WL 5972702 (N.D. Cal. Nov. 30, 2017) .................................... 8

*Elec. Frontier Found. v. DOJ*,
739 F.3d 1 (D.C. Cir. 2014) ..................................................................................... 25

*Exxon Corp. v. DOE*,
585 F. Supp. 690 (D.D.C. 1983) ................................................................................ 26

*Fed. Open Mkt. Comm. of the Fed. Reserve Sys. v. Merrill*,
443 U.S. 340 (1979) ................................................................................................ 15

*Goland v. CIA*,
607 F.2d 339 (D.C. Cir. 1978) ................................................................................... 2

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997) .............................................................................. 16, 19

*In re Sealed Case*,
146 F.3d 881 (D.C. Cir. 1998) ................................................................................... 26

*\*Iturralde v. Comptroller of the Currency*,
315 F.3d 311 (D.C. Cir. 2003) ................................................................................. 1, 2

*Judicial Watch v. Dep't of Energy*,
412 F.3d 125 (D.C. Cir. 2005) .................................................................................. 19

*Judicial Watch v. DOJ*,
432 F.3d 366 (D.C. Cir. 2005) .................................................................................. 25

*Judicial Watch, Inc. v. Dep't of Def.*,
847 F.3d 735 (D.C. Cir. 2017) ......................................................................... 7, 15, 17

*Judicial Watch, Inc. v. U.S. Dep't of Treasury*,
796 F. Supp. 2d 13 (D.D.C. 2011) ............................................................................. 18

*\*Leopold v. CIA*,
89 F. Supp. 3d 12 (D.D.C. 2015) ......................................................................... *passim*

*Machado Amadis v. DOJ*,
No. 16-cv-2230 (TNM), 2019 WL 400619 (D.D.C. Jan. 31, 2019) ........................................... 8

*Mannina v. D.C.*,
No. 1:15-cv-931 (KBJ/RMM), 2019 WL 1993780 (D.D.C. May 6, 2019) ....................... 16, 19

*Mead Data Central, Inc. v. U.S. Dept. of Air Force*,
   566 F.2d 242 (D.C. Cir. 1977) ............................................................... 24

*Mobley v. CIA*,
   924 F. Supp. 2d 24 (D.D.C. 2013) ............................................................ 4

*Morley v. CIA*,
   508 F.3d 1108 (D.C. Cir. 2007) ............................................................... 1

*N. L. R. B. v. Sears, Roebuck & Co.*,
   421 U.S. 132 (1975) ......................................................................... 8, 15

*\*Nat'l Sec. Archive v. CIA*,
   752 F.3d 460 (D.C. Cir. 2014) ..................................................... *passim*

*Nat'l Sec. Counselors v. CIA*,
   960 F. Supp. 2d 101 (D.D.C. 2013) ...................................................... 2, 6

*\*New York Times Co. v. DOJ*,
   282 F. Supp. 3d 234 (D.D.C. 2017) ................................................... 23, 24

*Protect Democracy Project, Inc. v. Dep't of Def.*,
   320 F. Supp. 3d 162 (D.D.C. 2018) ....................................................... 23

*Reporters Comm. for Freedom of Press v. Federal Bureau of Investigation*,
   877 F.3d 399 (D.C. Cir. 2017) ............................................................... 1

*Rockwell Int'l Corp. v. DOJ*,
   235 F.3d 598 (D.C. Cir. 2001) ............................................................. 22

*Rosenberg v. Dep't of Def.*,
   342 F. Supp. 3d 62 (D.D.C. 2018) ......................................................... 9

*SafeCard Servs., Inc. v. SEC*,
   926 F.2d 1197 (D.C. Cir. 1991) .......................................................... 2, 3

*Schlefer v. United States*,
   702 F.2d 233 (D.C. Cir. 1983) ............................................................. 25

*Shurtleff v. EPA*,
   991 F. Supp. 2d 1 (D.D.C. 2013) .......................................................... 19

*Tax Analysts v. IRS*,
   117 F.3d 607 (D.C. Cir. 1997) ............................................................. 24

*United States v. Deloitte LLP*,
   610 F.3d 129 (D.C. Cir. 2010) ........................................................ 26, 27

**STATUTES**

5 U.S.C. § 552 ......................................................................................................... 7, 9, 14

50 U.S.C. § 3021 .......................................................................................................... 19

Pub. L. No. 114-185, 130 Stat. 538 (codified at 5 U.S.C. § 552) .................................... 7

**OTHER AUTHORITIES**

H.R. Rep. No. 114-391 (2016) ......................................................................................... 8

https://www.cia.gov/library/readingroom/document/6541713 ...................................... 23

S. Rep. No. 114-4 (2015) ................................................................................................. 8

## INTRODUCTION

Defendant Central Intelligence Agency has fully and properly responded to Plaintiffs' Freedom of Information Act request, including conducting a reasonable search for hundreds of highly sensitive, properly classified intelligence documents related to a previously classified program, and properly withholding certain documents pursuant to Exemption Five.

## ARGUMENT

### I.  CIA Conducted a Reasonable Search

As described in Defendant's motion for summary judgment, Plaintiffs' FOIA request listed over 800 citations from the Executive Summary and sought the specific underlying documents.  Many of these citations were duplicative; CIA searched for and found several hundred responsive documents.  After filing Defendant's motion for summary judgment, CIA located a handful of additional documents and provided them to Plaintiff.  *See* Declaration of Vanna Blaine (attached to Plaintiffs' Cross Motion).  That leaves only eleven documents unaccounted for from over 800 citations.  *Id*.  With respect to those eleven documents, CIA's declarations establish that they conducted a reasonable search, including all locations likely to contain responsive documents.  Plaintiffs speculate that CIA might not have searched relevant locations and might not have conducted sufficient research to identify the cited documents.  But CIA has more than complied with its obligations under FOIA.

It is well-established that "the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search," *Iturralde v. Comptroller of the Currency,* 315 F.3d 311, 315 (D.C. Cir. 2003), and that the "failure of an agency to turn up one specific document in its search does not alone render a search inadequate," *Morley v. CIA,* 508 F.3d 1108, 1120 (D.C. Cir. 2007); *Reporters Comm. v. FBI*, 877 F.3d 399, 408 (D.C. Cir. 2017) ("That a few responsive documents may have slipped

1

through the cracks does not, without more, call into question the search's overall adequacy.") *Nat'l Sec. Counselors v. CIA,* 960 F. Supp. 2d 101, 155 (D.D.C. 2013) (failure to find specific documents does not render search unreasonable). "After all, particular documents may have been accidentally lost or destroyed, or a reasonable and thorough search may have missed them." *Iturralde*, 315 F.3d at 315; *see also Goland v. CIA*, 607 F.2d 339, 353 (D.C. Cir. 1978). In short, "[m]ere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them." *Iturralde*, 315 F.3d at 315 (quoting *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991)); *see also DiBacco v. U.S. Army*, 795 F.3d 178, 190 (D.C. Cir. 2015) ("FOIA is not a wishing well; it only requires a reasonable search for records an agency actually has.").

Here, the detailed affidavits submitted by CIA describe reasonable search methods, and CIA is therefore entitled to summary judgment, regardless of whether or not these specific documents were located. It bears repeating that the citations are not drawn from a CIA-originated document but from a Congressionally-authored document that does not necessarily identify documents in the same way that CIA personnel would identify them. *See ACLU v. CIA*, 823 F.3d 655, 659-61 (D.C. Cir. 2016), *cert. denied*, 137 S. Ct. 1837 (2017) (describing origins of SSCI Report); 2015 Higgins Decl. ¶¶ 10-20 (attached to Plaintiffs' Motion for Summary Judgment (hereinafter "Pls' MSJ") at Ex 1, describing origins of Executive Summary); Shiner Decl. ¶¶ 8-9 (describing efforts to identify responsive documents); Blaine Decl. ¶¶ 5-6. It is unsurprising that out of over 800 citations, there were a few documents that CIA could not reasonably identify and locate.

First, Plaintiffs dispute the explanation in the Blaine Declaration that the redacted footnotes simply do not provide enough information to identify three of the documents: FN45, FN722, FN1746. *See* Blaine Decl. & Ex. CIA did in fact search for each of these documents,

using the information given, but was unable to locate any documents precisely matching the

descriptions given.  Plaintiffs claim that CIA is obligated to look at unredacted versions of the

Executive Summary or the Full Report or drafts thereof, speculating that similar footnotes in the

draft or in the Full report might not be so redacted and might help identify the documents.  *See*

Pls MSJ at 1.  CIA has consulted the version of the Executive Summary that it has. While CIA

did not consult the 2012 draft, that draft is a Congressional record provided solely for the

purpose of developing the final report and may only be used with Congress's permission.  *See*

Higgins Decl ¶¶ 10-16 (attached to Pls' MSJ) (describing stringent conditions placed by

Congress on the Report); *ACLU v. CIA*, 823 F.3d at 659-61.  In any event, Plaintiffs are merely

speculating as to what might lay under the redactions and whether it would help further identify

the documents.  Such speculation is insufficient to overcome a facially adequate declaration.

*Safecard Servs*., 926 F.2d at 1201.  Here, the declarations establish that CIA searched RDINet,

the most likely location to contain responsive documents, using search terms derived from the

citation.  Shiner Decl. ¶¶ 8-9.  For the documents not located there, CIA searched all potentially

relevant offices (including the Office of Congressional Affairs, Center for the Study of

Intelligence, Office of the Inspector General, and Office of General Counsel).  *Id.*  CIA then

conducted yet additional supplemental searches, consulting with additional knowledgeable

personnel.  Blaine Decl. ¶¶ 4-5.  Documents matching these descriptions did not turn up, despite

a reasonable search.

Second, Plaintiffs argue that CIA should have been able to locate FN2461 because the

purported addressee was a CIA official at the time and the author was Senate staff.  Pls' MSJ at

2.  Although one might reasonably speculate that such a document would be maintained in the

Office of Congressional Affairs, CIA searched OCA (inclusive of the archives), using search

terms from the title of the document.  That is all that FOIA requires, and it is simply not true that

3

the declaration has "no description" of how the search was conducted.  Knowledgeable personnel were consulted and search terms were derived from the title in the request.  Shiner Decl. ¶¶ 8-9; Blaine Decl. ¶¶ 4-5.  Plaintiffs' speculation that it might nonetheless exist in archives "or other location" is not sufficient to overcome the adequate declarations submitted here.

Third, Plaintiffs similarly argue that CIA should have been able to locate FN28 in OCA or in OCA archives.  Pls' MSJ 3-4.  But, as described above, CIA properly searched OCA (inclusive of the archives), using search terms from the title of the document.  This is all that FOIA requires.

Fourth, Plaintiffs argue that CIA should have been able to locate FN131, identified in the Executive Summary as a "CIA paper entitled 'Abu Zubaydah', dated March 2005."  Pls' MSJ at 4-5.  CIA no doubt has documents about Abu Zubaydah, but a reasonable search did not turn up a "paper" specifically matching this description.  Plaintiff speculates that CIA can search all files related to Abu Zubaydah and use information from the Executive Summary to identify the relevant document.[1]  But CIA has searched all files likely to contain responsive documents and cannot locate a document matching the description given here.  Plaintiffs also complain that CIA did not specifically consult the "Special Review Team," but the Special Review Team reviewed only a portion of the documents that went to the Committee, and no longer exists.  CIA reviewed documents located on RDINet, which is where such documents would likely be found. In any event, CIA is not required to follow up on leads Plaintiffs provide after the search is complete. *See Mobley v. CIA,* 924 F. Supp. 2d 24, 42 n. 14 (D.D.C. 2013) (holding FBI had "no obligation

---

[1] Plaintiffs speculate that CIA could derive keywords from the text of the Executive Summary, but the Executive Summary does not purport to quote the Abu Zubaydah paper and cites several documents for the proposition that Plaintiffs quote, not just the paper entitled "Abu Zubaydah." Pls' Ex 2.  Accordingly, there is no reason to think that the keywords Plaintiffs chose from the Executive Summary language would actually appear in the paper.

to follow up on any leads contained in" records that FBI was not aware of "before the conclusion of the FBI's search process").

Fifth, Plaintiffs argue that CIA should have located Document FN719, a letter sent to the Red Cross on a specific date, by specifically searching the files of the then-Acting General Counsel.  Pls' MSJ at 5-6.  But the declarations state that CIA searched the Office of General Counsel, inclusive of Mr. Rizzo's files, and did not locate the document.  *See* Shiner Decl. ¶¶ 8-9; Blaine Decl. ¶¶ 4-5.

Sixth, Plaintiffs argue that CIA should have located FN904, CIA responses to SSCI Questions For the Record dated June 18, 2007, by searching the Executive Staff of the OCA. But the declarations state that CIA searched OCA, inclusive of the Executive Staff files, and did not locate the document as described here. *See* Shiner Decl. ¶¶ 8-9; Blaine Decl. ¶¶ 4-5.

Seventh, Plaintiffs argue that CIA should have been able to locate FN1943 – a document identified only as "CIA Notes" by referring to the text of the Executive Summary, which describes a Congressional briefing.  Pls' MSJ at 7.  But the text of the Executive Summary cites to several different documents for the proposition stated, not just "CIA notes."  Plaintiffs' request was for a specific document, which CIA was not able to locate or identify given the information provided.  Blaine Decl.  ¶¶ 4-5.[2]  And in any event, CIA searched OCA, using the title (and subject) given. *See* Shiner Decl. ¶¶ 8-9; Blaine Decl. ¶¶ 4-5.

Finally, Plaintiffs contend that CIA's search for FN2247 was inadequate because the declarations do not specify a search of the Counterterrorism Center and do not specify whether a specific quote was searched.  But CIA searched RDINet, where such documents are expected to

---

[2] Despite the title, it is not entirely clear that the Summary is even referencing a CIA document. It is cited in a sentence characterizing "Committee records" about a CIA briefing.  In other words, it is at least possible that this document refers to committee notes about a CIA briefing, but it not possible to tell from the text.

reside, and used reasonable search terms.  Nonetheless, in an abundance of caution, CIA is conducting yet another supplemental search for this document in CTC and will update the Plaintiffs when that search is complete.

In short, CIA's search turned up almost all of the hundreds of specific documents sought, and the declarations are sufficient to show that the search was reasonable.

## II.   CIA Properly Invoked the Deliberative Process Privilege.

### A.  The Declaration and Index Properly Describe the Application of the Privilege.

Plaintiffs argue, without warrant, that "there are no instances in which the CIA has provided" all of the information necessary to make a determination with respect to deliberative process.  Pls' MSJ at 8-10.  In fact, CIA has provided the necessary information with respect to each document when one reads the declaration in conjunction with the index.  In attempting to apply a heightened standard, Plaintiffs rely primarily on a 2013 district court opinion which required an agency to show "(1) the nature of the specific deliberative process involved, (2) the function and significance of the document in that process, and (3) the nature of the decisionmaking authority vested in the document's author and recipient."  *Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 189 (D.D.C. 2013).  The D.C. Circuit has generally not required the level of specificity Plaintiffs' brief suggests is required.  *See, e.g., Abtew v. DHS*, 808 F.3d 895, 898 (D.C. Cir. 2015) (requiring only that the agency demonstrate the document is both predecisional and deliberative).  And, in fact, district courts in this district have often not required the identification of a specific decision to which the document relates, *Leopold v. CIA*, 89 F. Supp. 3d 12, 19 (D.D.C. 2015) (citation omitted), as long as the declarations establish that the document "reflects the give-and-take of the consultative process."  *Coastal States*, 617 F.2d at 854, 866.

Regardless of the level of specificity required, CIA has provided more than sufficient information to show the predecisional nature of the communication and how the document relates to the deliberative process at issue.  The Shiner Declaration describes generally five categories of documents and how they are predecisional and deliberative; the index provides additional information as to how each individual document or redaction fits into the general category.  *See* Shiner Decl. ¶¶ 12-20.  In the case of partially released documents, the documents themselves often provide additional information and context about the relevant deliberative process and how the document relates.

Plaintiffs also argue generally that the allegations of harm stemming from disclosure are "boilerplate" and insufficient.  As the D.C. Circuit has explained, "[t]he deliberative process privilege reflects the commonsense notion that agencies craft better rules when their employees can spell out in writing the pitfalls as well as strengths of policy options, coupled with the understanding that employees would be chilled from such rigorous deliberation if they feared it might become public."  *Judicial Watch, Inc. v. Dep't of Def.* 847 F.3d 735, 739 (D.C. Cir. 2017).

Plaintiffs argue that the FOIA Improvement Act of 2015 amended FOIA to add a more stringent, albeit general, requirement that an agency should withhold information only if it "reasonably foresees that disclosure would harm an interest protected" by the statute.  See Pub. L. No. 114-185, 130 Stat. 538 (codified at 5 U.S.C. § 552); *see also* 5 U.S.C. § 552(a)(8)(A)(i)(I).  Plaintiffs believe this requires a specific showing of harm as to each document withheld, but the statute is not nearly so demanding, and a showing of particularized harms with respect to the interests protected by Exemption 5, specifically with respect to the deliberative-process privilege, is both redundant and inconsistent with congressional intent in enacting both Exemption 5 and the FOIA Improvement Act. The FOIA Improvement Act simply codified a policy that the government already observed, that it should evaluate whether

privileged documents should be discretionarily released. *See, e.g.*, H.R. Rep. No. 114-391, at 9 (2016) (noting that the policy was established by executive memoranda in 2009); S. Rep. No. 114-4 at 8 (2015).  Congress made clear that the FOIA Improvement Act "does not alter the scope of information that is covered under an exemption," H.R. Rep. No. 114-391, at 10 (2016). Courts have confirmed that the deliberative-process privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001); *see also, e.g.*, *Sears, Roebuck & Co.*, 421 U.S. at 150.  Here, the declarant made a specific determination that such harm would occur would these particular documents and portions of documents be disclosed.  That is all that is required to meet the requirements of Exemption 5 as amended by the FOIA Improvement Act.

In *Cause of Action Institute v. DOJ*, 330 F. Supp. 3d 336 (D.D.C. 2018), the plaintiff contended that Congress sought to "raise the standard by which an agency evaluates its withholdings" in enacting the foreseeable-harm provision of the FOIA Improvement Act of 2016; the government responded with the same arguments presented in this matter. *Id.* at 354-55. Ultimately, the district court concluded that it "need not resolve this dispute" because the government's assertion of Exemption 5 prevailed under either approach. *Id.* at 355. The Court observed that the agency "asserted in a declaration the agency's reticence to have its communications disclosed and explained the manner in which disclosure would stifle 'full and frank' communication." *Id.* That is enough: "[n]o more is required on this front," regardless how the foreseeable-harm provision is applied. *Id.*; *see also, e.g.*, *Machado Amadis v. DOJ*, No. 16-cv-2230 (TNM), 2019 WL 400619, at *11 (D.D.C. Jan. 31, 2019) (addressing foreseeable harm from disclosure of deliberative materials). *Cf. Ecological Rights Found. v. Fed. Emergency Mgmt. Agency*, No. 16-cv-5254 (MEJ), 2017 WL 5972702, at *6 (N.D. Cal. Nov. 30, 2017)

(finding insufficient showing of foreseeable harm where agency did not provide "*any*

justification for how the agency would be harmed by disclosure" (emphasis added)). The Court

should follow suit here and conclude that a declaration identifying the manner in which agency

deliberations would be disrupted is sufficient to prevail at summary judgment.

In any event, even those courts that require an additional showing of harm do not require

the level of specificity that Plaintiffs argue is required. *Rosenberg v. Dep't of Def.*, 342 F. Supp.

3d 62, 79 (D.D.C. 2018) ("the court does not read the statutory 'foreseeable harm' requirement

to go so far as to require the government to identify harm likely to result from disclosure of *each*

of its Exemption 5 withholdings. A categorical approach will do.").  And CIA has made the

showing that Plaintiffs think is required by explaining that CIA personnel carefully reviewed

each withholding, and that CIA determined that "disclosure of these documents would

significantly hamper the ability of Agency personnel to candidly discuss and assess the viability

of certain courses of action" and that "revealing this information could mislead or confuse the

public by disclosing rationales that were not the basis for the Agency's final decisions."  Shiner

Decl. ¶¶ 10, 20, 25.

Plaintiffs find it "significant" that the RDI program is no longer in existence and that

many of the documents are old.  But the FOIA protection for these documents has not lapsed.

*See Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 464 (D.C. Cir. 2014) ("We must adhere to the text

of FOIA and cannot judicially invent a new time limit for Exemption 5."); 5 U.S.C. § 552(b)(5)

("the deliberative process privilege shall not apply to records created 25 years or more before the

date on which the records were requested").  The termination of the controversial RDI program

does not undermine the claim of privilege with respect to documents pre-dating that termination;

it only establishes that the documents were predecisional and deliberative and often authored in

situations in which it was extremely important that the authors feel free to express candid and thorough opinions.

### B. Talking Points.

Plaintiffs dispute that the deliberative process privilege covers portions of two partially released documents reflecting talking points developed for use in interagency meetings.  *See* Pls' MSJ at 10 (Documents 35 and 58).  Document 35 is titled "DRAFT Talking Points for the ADCI: Endgame Options and Plans for CIA Detainees" and the Index reflects that CIA redacted "pre-decisional talking points and policy options/draft of memorandum for eventual dissemination once approved."  Accordingly, it is clear that it is predecisional and deliberative at least with respect to the "endgame options" being discussed.  Document 58 is an email containing a set of draft talking points for a call to the Deputy Secretary of State and the index reflects that information was redacted to "protect interagency frank discussion and opinions regarding the call."  The unredacted portions make clear that the call in general was about the "efficacy of the program and the value of the intel."  The Shiner Declaration further explains that this "guidance is crafted with the eye toward anticipating questions and inquiries from individuals at the meetings" and that the talking points serve as presentation tools that provide potential responses or points to be made should certain queries arise, but are not polished pieces or prepared final remarks intended to be delivered as written." These talking points are therefore predecisional and deliberative, "both as to the remarks made at the meetings and as to the subject matter of the deliberations at the meetings."  Shiner Decl. ¶ 15.  The cases cited by Plaintiffs are thus readily distinguishable.  *Cf. Bloche v. Dep't of Def.,* No. CV 07-2050 (RC), 2019 WL 1428337, at *6 (D.D.C. Mar. 29, 2019) ("a select few of Defendants' claims identify neither an internal policy-oriented decisionmaking process nor a possible public communication being planned to an outside entity").  Here, it is clear that both documents are predecisional as to

remarks at an interagency meeting, and as to the specific policy and process judgments being discussed at those meetings.

### C. Cables.

Plaintiffs dispute the applicability of the deliberative process privilege to three partially released internal CIA cables containing deliberations about the then-ongoing interrogation of Abu Zubaydah.  Pls' MSJ at 11-12.  Document 3 is a cable entitled "HQS FEEDBACK ON ISSUES PENDING FOR INTERROGATIONS OF ABU ZUBAYDAH".  Plaintiffs attached a prior version of this document, which was later re-processed after the decision in *Am. Civil Liberties Union v. Dep't of Def.*, No. 15 CIV 9317 (AKH), 2017 WL 4326524, at *8 (S.D.N.Y. Sept. 27, 2017); CIA cannot confirm that the re-processed version was provided to Plaintiffs as intended, but it was emailed to them today May 20, 2019, and is attached here.  *See* Attachment 1.  The cable is from Agency employees at Headquarters to personnel in the field and "provides preliminary input in advance of a final decision from Headquarters as to how to conduct the next phase of an interrogation and requests additional information from employees in the field for the purpose of making a final decision on a certain issue."  Shiner Decl. ¶ 16.  The index adds that CIA has withheld "the assessments regarding the RDI program that, at the time, were still being considered by the Agency in anticipation of a final policy/decision regarding ongoing interrogations."  The document itself reflects that certain factual and post-decisional information from the document was released, which bolsters rather than undermines the claim of privilege as to the remainder, because it shows that CIA carefully segregated appropriate information.  Plaintiffs' speculation that the document must "represent the agency's position on an issue" is simply untrue.  The document "provides preliminary input in advance of a final decision . . . and requests additional information."  *Id.*  And there is simply no legal requirement that a privileged document be authored by a subordinate.  It is therefore clear that this is an interim document

reflecting a preliminary assessment from headquarters and that it explicitly is part of an ongoing

decisionmaking process which has not yet culminated in an agency decision.[3]

Document 19 is a cable titled "ADDITIONAL OPERATIONAL AND SECURITY

CONSIDERATIONS FOR THE NEXT PHASE OF ABU ZUBAYDAH INTERROGATION."

The index reflects that Exemption 5 is applied to protect "recommendations for interrogation

which lead to a final decision."   This is consistent with the Shiner Declaration's explanation that

certain cables are "from Agency employees in the field seeking the approval of Headquarters for

particular proposed courses of action."  Shiner Decl. ¶ 16.  Plaintiffs' argument that some of the

unredacted language speaks authoritatively does not undermine the declaration's plain finding

that the redacted material consists of "recommendations."[4]

Finally, Document 29 is a cable titled "EYES ONLY- STATUS OF INTERROGATION"

and the index reflect that CIA withheld "draft language waiting approval from headquarters."

*See also* Shiner Decl. ¶ 16.  Plaintiffs complain that the redactions appear to be broader than the

proposed draft language but only the portions that contain a recommended plan of action and

seek Headquarters guidance with that proposal remain redacted solely on the basis of Exemption

5.  *See* Attachment 2 (Document 29).

---

[3] Plaintiffs' primary argument to the contrary seems to be that a different court in a different circuit found the first version to require additional segregation of releasable material.  *Am. Civil Liberties Union v. Dep't of Def.*, No. 15 CIV. 9317 (AKH), 2017 WL 4326524, at *8 (S.D.N.Y. Sept. 27, 2017) (describing that portions of a document were properly withheld, but that a few additional sentences should be released).  CIA does not concede that this decision is correct, but in any event the re-processed version of the document accords with the SDNY opinion, and the Shiner Declaration is sufficient to support the redactions to this particular document.

[4] The SDNY court upheld the redactions to this document.  *See Am. Civil Liberties Union*, 2017 WL 4326524, at *8.

### D.  Drafts

Plaintiffs argue that drafts are not "*per se*" exempt and that CIA has not adequately explained why these particular draft documents are privileged (Documents 2, 24, 44).  Pls' MSJ at 13.  As explained in Defendant's Motion for Summary Judgment, drafts commonly satisfy the standard for the deliberative process privilege, and CIA has provided sufficient explanation as to why these particular drafts are covered by the privilege.  Defs' MSJ at 11-13.  Document 2 is a partially released document titled "D-R-A-F-T HOSTILE INTERROGATIONS: LEGAL CONSIDERATIONS FOR CIA OFFICERS".   As set forth in the Shiner Declaration, "the document was clearly marked draft and contains pre-decisional, intra-agency deliberations regarding the ongoing RDI program."  Shiner Decl. ¶ 13.  Similarly Document 24 is titled D-R-A-F-T LEGAL APPENDIX PARAGRAPHS, and the index establish that draft legal analysis and client communications are redacted.  Document 44 is titled D-R-A-F-T Memorandum; and it was withheld in full "to protect pre-decisional, intra- agency ongoing deliberative review of the RDI Program and attorney-client privileged communications."  The Shiner Declaration further establishes that the listed drafts "do not convey final Agency viewpoints on a particular matter, but reflect different considerations, opinions, options, and approaches that preceded an ultimate decision or are part of a policymaking process."  *Id*.  These draft documents outline "legal considerations for CIA officers," draft legal analysis and otherwise deliberative assessments regarding the review of an ongoing program, and they are plainly in the heart of the deliberative process privilege.  It is of no relevance whether there were further or final versions of the document.  *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014) ("There may be no final agency document because a draft died on the vine. But the draft is still a draft and thus still pre-decisional and deliberative.")

### E.  Memoranda For the Record.

Plaintiffs argue that several memoranda (including at least Documents 39-42, 45- 46, 50,

56) withheld in full are not privileged because they do not reflect intra- or inter-agency

communications and because they contain purely factual material.   Pls' MSJ at 13-14.  As an

initial matter, all of these documents are internal to CIA, and were created by CIA for CIA use.

*See* Shiner Decl. ¶ 14 ("These MFRs are internal CIA documents that reflect CIA impressions,

analysis, opinions, and recollections of the meetings and were created by CIA employees to

memorialize discussions and interactions with Congress, where those discussions could serve as

a basis for future Agency decisionmaking").  Although the MFRs contain information about

communications with other entities, the documents themselves are "intra-agency" memoranda

and therefore qualify for Exemption 5 protection as a threshold matter.  *See* 5 U.S.C. § 552(b)(5).

The Shiner Declaration further acknowledges that the documents contain some material that

might not be privileged in another context, but explains that "the selection and context of facts

reveals important deliberative information about the Agency's considerations in the ongoing

deliberative process." *Id*.  The selection and analysis of facts provided to superiors informed

both the Agency's decisions regarding its course of dealing with SSCI and its own then-ongoing

review of the RDI program.  *Cf. Assassination Archives & Research Ctr., Inc. v. CIA*, 720 F.

Supp. 217, 220 (D.D.C. 1989) (upholding withholding of MFR regarding congressional

inquiries), *aff'd*, No. 89-5414, 1990 WL 123924 (D.C. Cir. Aug. 13, 1990). While it is true that

"[p]urely factual material usually cannot be withheld under Exemption 5," such material is often

withheld when the selection of facts for inclusion "reflects an 'exercise of discretion and

judgment calls'" and where its exposure would enable the public to probe an agency's

deliberative processes.  *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 513 (D.C.

Cir. 2011). This is because "the privilege serves to protect the deliberative process itself, not

merely documents containing deliberative material." *Id*. at 1537; *Leopold v. CIA*, 89 F. Supp. 3d 12, 21 (D.D.C. 2015).

### F.  OIG Report.

Plaintiffs argue that some of the OIG recommendations redacted from Document 1 may have been "adopted" by the agency and therefore must be released.  Pls' MSJ at 14.  As an initial matter, Plaintiffs do not seriously dispute that the redacted recommendations were deliberative in the first instance.   Shiner Decl. ¶ 18.   And deliberative documents "remain privileged even after the decision to which they pertain may have been effected, since disclosure at any time could inhibit the free flow of advice, including analysis, reports, and expression of opinion within the agency."  *Fed. Open Mkt. Comm. of the Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 360 (1979).  "[A] document can lose its predecisional character—and the protections of the privilege—if an agency adopts the document as its own."  *Judicial Watch, Inc. v. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017).  But to "adopt a deliberative document, it is not enough for an agency to make vague or equivocal statements implying that a position presented in a deliberative document has merit; instead, the agency must make an "express[ ]" choice to use a deliberative document as a source of agency guidance.  *Id*. (citing *Sears*, 421 U.S. at 161).  Plaintiffs point to no such adoption here; they only speculate as to what might be under the redactions based on a representation in the CIA response to the SSCI Report that CIA took actions in response to the IG report and that "CIA took the recommendations seriously."  *See* Pls' Ex. 5.  This is not the "express" statement of adoption required by the D.C. Circuit, and it is not tied to the redacted material.

### G.  Other Internal Memoranda

Plaintiffs challenge the withholdings from three other partially released internal memoranda (Documents 5, 6, 10).  Pls' MSJ at 14-24.

**Document 5** is an internal memorandum identified as "OPERATIONAL REVIEW OF CIA DETAINEE PROGRAM" and the index explains that Exemption 5 was asserted to protect predecisional intra-agency deliberations, including specified redactions that contain "internal recommendations and opinions from the Agency's Chief of Information Operations center."  The index further explains that "release of the information would chill candid discussions among the senior leaders at the Agency."  The Shiner Declaration explains that like the other internal memoranda at issue, "[t]hese internal recommendations and opinions concerning different aspects of the RDI program were communicated to senior Agency leaders to help inform the decision making process."  Shiner Decl. ¶¶ 11, 17.

Plaintiffs primarily complain that CIA released some plainly deliberative information from Document 5, such as internal recommendations that later became policy, while redacting the most sensitive portions.  It is hard to see how this carefully targeted use of redactions helps Plaintiffs' position.  Rather, it shows that CIA identified only the most sensitive information for redaction, not that all of it can be released.  *Cf. Mannina v. D.C.,* No. 1:15-cv-931 (KBJ/RMM), 2019 WL 1993780, at *7 (D.D.C. May 6, 2019) ("Waiver of the deliberative process privilege occurs where privileged material has been voluntarily disclosed" and extends only to "the document or information specifically released, and not for related materials."); *see also In re Sealed Case*, 121 F.3d at 741 (citing cases).[5]  Indeed, Plaintiffs' proposed analysis here would penalize the agency for discretionary releases and make it less likely for agencies to determine that discretionary releases are appropriate.  *Nat'l Sec. Archive*, 752 F.3d at 464 ("Penalizing

---

[5] Moreover, on the pages submitted by Plaintiff for review, there is an obvious explanation for the targeted redactions.  The highest-level general findings are released; and the detailed opinions and recommendations are not.

agencies in that way would discourage them from voluntarily releasing information, which would thwart the broader objective of transparent and open government.").

Second, Plaintiffs speculate that some unidentified decisionmaker may have adopted the recommendations and that the agency is required to prove the negative – that they were not adopted. But the Shiner Declaration establishes that the recommendations covered by the privilege were predecisional and communicated to senior officials in advance of a final decision. Shiner Decl. ¶ 17. And in order to vitiate the privilege, an "adoption" must be "express" and is not accomplished by mere agreement with a recommendation or following a recommendation. *Judicial Watch, Inc.*, 847 F.3d at 739. Plaintiffs have pointed to no evidence of such express adoption.[6]

Plaintiffs further speculate that some of the findings may not be deliberative because they reflect an assessment of the agency's past activity. Such assessments, however, can be part of an ongoing deliberative process (i.e., the then ongoing reevaluation of the RDI program), and the Declaration and index establish that these assessments are in fact part of such a process. *Leopold v. CIA*, 89 F. Supp. 3d 12, 20 (D.D.C. 2015) ("documents are not postdecisional simply because they address past events."). As with Plaintiffs' previous litigation related to similar documents,

---

[6] Defendant therefore respectfully disagrees with the cited decision, *De Sousa v. CIA*, 239 F. Supp. 3d 179, 202 (D.D.C. 2017), as contrary to D.C. Circuit precedent, but it is also readily distinguishable. The court in *De Sousa* "was unable to determine whether the Department of Defense ma[de] an express choice to use a deliberative document;" here there is no indication whatsoever of an express adoption and no reason for a Court to find one based on Plaintiffs' speculation. *Cf. Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014) ("A privilege contingent on later events—such as whether the draft ultimately evolved into a final agency position—would be an uncertain privilege, and as the Supreme Court has said, an uncertain privilege is 'little better than no privilege at all.'").

these documents were "not intended to memorialize past decisions. Rather, they were designed to aid decisions that CIA officials would need to make, going forward." *Id.*

**Document 6** is a partially released memorandum entitled "EFFECTIVENESS OF THE CIA COUNTERTERRORIST INTERROGATION TECHNIQUES" and the index explains that Exemption (b)(5) was asserted in a targeted manner over portions of 3 paragraphs to cover specific "assessments and recommendations for the National Security Advisor to assist in determining the effectiveness of the interrogation techniques employed in the RDI Program" and a summary of legal analysis. And indeed, on its face, the document is intended to evaluate the effectiveness of the interrogation program as part of an interagency effort to evaluate the program and determine its disposition.

Plaintiffs make several arguments with respect to these three paragraphs. First, Plaintiffs speculate that the redactions cover purely factual or otherwise non-deliberative material. A fair amount of factual material is redacted pursuant to Exemptions 1 and 3, and other purely factual information was released, as reflected on the face of the documents, but these specific paragraphs also contain "assessments and recommendations" regarding the overall program. Any factual material included in that assessment is inextricably intertwined with the deliberative process material. *See* Shiner Decl. ¶¶ 17, 19; *see also Judicial Watch, Inc. v. U.S. Dep't of Treasury*, 796 F. Supp. 2d 13, 28 (D.D.C. 2011) ("Since the decision to include or exclude certain factual information from an analytical memorandum is an important part of the deliberative process, this Circuit has found factual information highlighted in internal analytical memoranda to be protected under the deliberative process privilege."). This is an internal analytical memorandum, and limited information containing deliberative assessments and recommendations was redacted.

Second, Plaintiffs argue that it is not an "inter-agency" memorandum because it was sent to a White House official. But the National Security Advisor is a senior aide to the President,

and is currently responsible, at the direction of the President, for setting the agenda of the

National Security Council.  *See generally* NSPD-4 (April 4, 2017); *see also* 50 U.S.C. § 3021.[7]

The D.C. Circuit has previously rejected the argument that memoranda including White House

officials do not qualify for the privilege.  *Judicial Watch v. Dep't of Energy*, 412 F.3d 125 (D.C.

Cir. 2005); *Shurtleff v. EPA*, 991 F. Supp. 2d 1, 14–15 (D.D.C. 2013).  The Circuit deemed it

"inconceivable" that documents involving a White House policy committee would not be

protected by Exemption 5, because the exemption protects all of the "decision-making processes

of the Executive Branch," whether the decision results in agency policy or Administration

policy. *Judicial Watch*, 412 F.3d at 130. "That the President, rather than an agency, initiated the

policy development process is of no moment; what matters is whether a document will expose

the pre-decisional and deliberative processes of the Executive Branch." *Id*. at 131.  For the same

reason, a document prepared by an agency official at the request of the National Security

Advisor – who is plainly a member of the Executive Branch – would expose the predecisional

and deliberative processes of the Executive Branch.

Finally, Plaintiffs argue that the disclosure of a different memorandum – with a different

author and different recipient but with some similar language – suggests that Document 6 is

over-redacted.  As an initial matter, there is no subject matter waiver over the deliberative

process privilege such that disclosure of parts of a deliberation do not waive all privilege as to all

of the deliberative process; nor is there a waiver as to other documents or other deliberations.

*See In re Sealed Case*, 121 F.3d at 741; *Mannina v. D.C.*, 2019 WL 1993780, at *7 ("Waiver of

the deliberative process privilege occurs where privileged material has been voluntarily

---

[7] The NSC is comprised of various agency officials who advise the President with respect to the integration of domestic, foreign, and military policies relating to the national security.  *Id.*; *see generally Armstrong v. Exec. Office of the President*, 90 F.3d 553 (D.C. Cir. 1996).  The NSC advises the President and is in part an interagency forum, for coordination of security policy.

disclosed" and extends only to "the document or information specifically released, and not for related materials."). Second, these documents are on their face are different, prepared by different people, for a different purpose. Document 6 is from the Director to the National Security Advisor in response to a specific request to evaluate the overall efficacy of the program; the 2005 Memorandum Plaintiffs cite is from a Legal Group within the Counterterrorism Center to Steven Bradbury at DOJ OLC in response to a specific request for underlying intelligence as part of the preparation of a legal opinion.

**Document 10** is a partially released memorandum from the CIA General Counsel to the Deputy Director containing an unfinished draft of a letter to a human rights organization, which shows the author's initial thought processes (as well as confidential legal advice to the client). Shiner Decl. ¶ 17 & Index. Plaintiffs argue that it is improperly redacted for several reasons. Pls' MSJ at 19-24. First, they argue that the draft is "post-decisional" because it "articulates a policy decision already made by the CIA" and that CIA has not shown that it is deliberative. On the contrary, it is a draft and is predecisional to communications with a human rights organization regarding the RDI program, and it was "communicated to senior Agency leaders to help inform the decision making process." Shiner Decl. ¶ 17. Communications about past events do not lose their privileged status because they relate to past communication, if they relate to contemplated agency measures. *Leopold,* 89 F. Supp. 3d at 20. Plaintiffs rely heavily on the lack of a decision from the D.C. Circuit specifically holding that "public relations" decision-making is the type of process protected by the deliberative process privilege. But that proposition is widely accepted in this district. *See, e.g., Bloche v. Dep't of Def.*, Civ. No. 07-2050 (RC), 2019 WL 1428337, at *4 (D.D.C. Mar. 29, 2019) (collecting cases from 2004 to the present and finding that messaging is a type of policy process). Moreover, a draft of a letter to a human rights organization is also necessarily more than a "public relations" effort; it involved

legal counsel in light of the legal and policy role played by such groups.  The involvement of

senior officials shows the importance of such communications to the agency and that it was part

of an effort to develop a coherent and persuasive public-facing position about the ongoing review

of the RDI program.

Second, Plaintiffs argue that it "may have lost its predecisional character" because there

is a released letter from the General Counsel to Human Rights Watch. Plaintiffs are speculating

that their Exhibit 7 (dated 8 months later) is the letter for which there is a draft, but they have not

established that proposition.  In fact, Plaintiffs' Exhibit 7 appears to be responding to a letter

dated later than Document 10.  Moreover, even if Plaintiffs were correct, the completion of a

final letter does not eliminate the privilege asserted over drafts.  *Nat'l Sec. Archive*, 752 F.3d at

463 ("A privilege contingent on later events—such as whether the draft ultimately evolved into a

final agency position—would be an uncertain privilege, and as the Supreme Court has said, an

uncertain privilege is 'little better than no privilege at all.'").

Finally, Plaintiffs speculate that the draft may contain some releasable material because

mundane language in the draft, standing alone, might show known factual material or otherwise

not relate to policy judgment.  Courts in this Circuit have generally declined to dissect a

deliberative draft in this way.  *See, e.g., Nat'l Security Archive*, 752 F.3d at 465; *Competitive

Enter. Inst. v. Office of Sci. & Tech. Policy*, 161 F. Supp. 3d 120, 132 (D.D.C. 2016) ("The

deliberative process privilege protects not only the content of drafts, but also the drafting process

itself."), *modified on other grounds*, 185 F. Supp. 3d 26 (D.D.C. 2016); *see also Dudman

Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1569 (D.C. Cir. 1987) ("disclosure of

editorial judgments—for example, decisions to insert or delete material or to change a draft's

focus or emphasis—would stifle . . . creative thinking and candid exchange of ideas").  Even a

sentence that Plaintiffs believe is "banal" is part of the agency's overall deliberations in deciding

whether and how and in what tone to respond to an outside entity; its inclusion or exclusion shows the development of a draft response over time and the nature of the agency's ongoing deliberations.

For these reasons, Defendant is entitled to summary judgment on the documents and portions of documents subject to the deliberative process privilege.

### III.    CIA Properly Invoked the Attorney-Client Privilege

CIA has established the applicability of the attorney-client communications privilege to the documents described in the Shiner Declaration and further identified on the Index.  *See* Shiner Decl. ¶¶ 21-23.  Plaintiffs generally challenge the invocation of the privilege and identify three specific documents with which they take issue.  Pls' MSJ at 24-26.  For each and every document so identified, the Shiner Declaration, in conjunction with the index, establishes that the document reflects confidential client communications for the purpose of securing legal advice. Shiner Decl. ¶¶ 21-23.  Each document either contains "confidential client communications between Agency employees and attorneys within the CIA on issues related to the former detention and interrogation program that were made for the purpose of obtaining legal advice" or it contains "confidential communications between attorneys within the CIA and Office of Legal Counsel (OLC) for the purpose of obtaining legal advice."  *Id*.  Accordingly, for each document, the Shiner Declaration has established that the communication was between attorney and client, that it is "confidential," that it is "for the purpose of obtaining legal advice," and that "confidentiality of these communications must be maintained."[8]  *Id*.  That is sufficient to answer

---

[8] As discussed in Defendants' summary judgment motion, the documents at issue were cited by the Senate Select Committee, and thus may have been obtained or accessed by the Committee, which does not waive the privilege. *Cf. Murphy v. Dep't of Army*, 613 F.2d 1151, 1156 (D.C. Cir. 1979).

most of Plaintiffs' objections, but the index and the partially redacted documents contain

additional information about each document highlighted by Plaintiffs' cross-motion.[9]

Plaintiffs identify **Document 61** as one with insufficient description.  This is an email

between CIA attorney and leadership, Shiner Decl. ¶ 21, containing interagency discussion,

including attorney-client communications and attorney work product created in reasonable

anticipation of litigation.  In conjunction with the Shiner Declaration statements above, the index

description is sufficient to establish the applicability of the privilege, and it is difficult to provide

more information about the "topic" at issue (beyond the fact that it relates to the RDI program)

without breaching the confidentiality of the communications.

**Document 7** is an OIG Report titled "DEATH OF A DETAINEE IN [Redacted] (2003-

7402-IG)" related to the death of a detainee.  *See*

https://www.cia.gov/library/readingroom/document/6541713.  CIA made limited redactions on

page 16 of the report pursuant to the attorney client communications privilege, redactions that

fall in the "findings" section of the report and reflect attorney-client communications that the

OIG presumably found relevant relating to "policy regarding custodial interrogations at the time

of Rahman's death."  *Id*. at i (table of contents); *see also* Index.  It is thus apparent from the

index and the redacted document that the redacted communications were attorney-client

communications regarding legal advice on custodial interrogations.  The specific identities of the

CIA attorneys involved are not relevant, and the specific nature of the confidential client

communications are not necessary to determine, as set forth in the Shiner Declaration, that these

---

[9] It is not necessary for the declaration to repeat for each such document that confidentiality has been maintained when it is true for all of the documents.  That is particularly true where, as here, there is no reason to infer a waiver and the highly sensitive nature of the advice on classified topics creates an expectation of confidentiality, as well as a legal requirement to maintain that confidentiality.  *See, e.g., Protect Democracy Project, Inc. v. Dep't of Def.*, 320 F. Supp. 3d 162, 175-76 (D.D.C. 2018); *New York Times Co. v. DOJ*, 282 F. Supp. 3d 234, 240 (D.D.C. 2017).

communications reflect confidential attorney-client communications.  Although Plaintiffs are

correct that the privilege is intended to protect "communications from the client," it is well-

settled that the privilege includes "communications from attorneys to their clients if the

communications rest on confidential information obtained from the client."  *Tax Analysts v. IRS*,

117 F.3d 607, 618 (D.C. Cir. 1997) (citing *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d

242, 254 (D.C. Cir. 1977)).   It is often true that legal advice from an attorney will necessarily

reflect the underlying confidential communications.  *See, e.g., New York Times Co. v. DOJ*, 282

F. Supp. 3d 234, 240 (D.D.C. 2017).  Here, the Shiner Declaration is sufficient to establish that

these communications reflect confidential client communications.

   **Document 8** is a partially released document titled "8 NOVEMBER 2006 MEETING

WITH ICRC REPS" and reflects "confidential attorney-client communications for the purpose of

obtaining legal advice based on impressions, deliberations, and advice from meeting with

ICRC."  Index.  On its face, the document is written by a CIA attorney to CIA clients, and the

Shiner Declaration establishes that it, like other such memoranda "contains "confidential client

communications between Agency employees and attorneys within the CIA on issues related to

the former detention and interrogation program that were made for the purpose of obtaining legal

advice."  Shiner Decl. ¶ 21.  Plaintiffs make much of the fact that the attorney apparently

attended the meeting with an outside entity (at clients' request) and is conveying information

back to the clients, but CIA has segregated and released some purely factual information

gathered by the attorney from a third party.  What remains is withheld in part on the grounds that

the information reflects confidential communications, and also on the grounds that it constitutes

predecisional, deliberative communications related to the meeting with the outside entity.  In

other words, the attorney-client communications claimed here are limited to those statements

reflecting confidential client communications, but the deliberative process privilege covers all of

the redacted information.  Although some factual information is necessarily redacted, it is

inextricably intertwined with the deliberative process or the confidential client communications.

Finally, Plaintiffs speculate that one or more of these documents may involve "secret

law" and therefore must be disclosed.  There is no apparent basis for this speculation.  It is true

that "an agency is not permitted to develop a body of secret law, used by it in the discharge of its

regulatory duties and in its dealings with the public, but hidden behind a veil of privilege because

it is not designated as formal, binding, or final."  *Elec. Frontier Found. v. DOJ*, 739 F.3d 1, 7

(D.C. Cir. 2014) (finding that legal advice was not secret law); *Schlefer v. United States*, 702

F.2d 233, 244 (D.C. Cir. 1983).  But Plaintiffs point to no reason to think that any of the

withheld documents constitute secret working law.  Rather, they are all described as

communications for the purpose of obtaining legal advice.  Plaintiffs point to no information that

suggest otherwise and cannot create an issue of material fact through speculation that the

declarations may be inaccurate.

Accordingly, CIA is entitled to summary judgment on the withholdings based on the

attorney client communications privilege.

### IV.    CIA Properly Invoked the Attorney Work Product Doctrine.

CIA has established the applicability of the attorney work product doctrine as to four

documents.  Shiner Decl. ¶ 24 & Index (Documents (6, 24, 52, 61).  The D.C. Circuit has

explained that the doctrine "should be interpreted broadly and held largely inviolate." *Judicial*

*Watch, Inc. v. DOJ*, 432 F.3d 366, 369 (D.C. Cir. 2005). Plaintiffs dispute this invocation

generally and with respect to three specific documents 6, 24, 61.  Pls' MSJ at 26-28. For each

document, the Shiner Declaration establishes that the withheld information was "prepared by an

OGC attorney in reasonable anticipation of litigation on a particular matter," and the Index

provides additional information about each document.  Shiner Decl. ¶ 24.  That is all that is required.

First, Plaintiffs try to raise the standard for invocation of the work product doctrine, requiring that the Court find that litigation is "likely."  There is no such requirement, and as Plaintiffs otherwise admit, the attorney need only have an "objectively reasonable" belief that litigation was "a real possibility."  *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998).  The Shiner Declaration establishes that they reasonable anticipated litigation, and in fact, there has been litigation related to the RDI program.[10]  Plaintiffs also argue, without citation, that Defendant should establish a counterfactual hypothetical, that if there were no possibility of litigation, the documents would not have been created.  There is no such requirement.  *See, e.g., United States v. Deloitte, LLP*, 610 F.3d 129, 138 (D.C. Cir. 2010) ("In short, a document can contain protected work-product material even though it serves multiple purposes, so long as the protected material was prepared because of the prospect of litigation.").

Second, Plaintiffs claim that two of the documents were not created by an attorney and therefore are not eligible for the privilege.  **Document 6** is from the Director of the CIA, and the work product doctrine is applied only to those "portions of the document which reflect the work of an attorney in reasonable anticipation of litigation."  Index.  In fact, one redacted paragraph summarizes legal analysis by an attorney that was prepared in reasonable anticipation of litigation.  **Document 61** is an email discussion between a CIA attorney and leadership that constitutes "attorney work product created in reasonable anticipation of litigation."  The record is sufficient to conclude that these documents include information properly withheld pursuant to

---

[10] Anticipation of adversarial administrative proceedings also qualifies for protection under the doctrine.  *See, e.g., Exxon Corp. v. DOE*, 585 F. Supp. 690, 700 (D.D.C. 1983) (upholding use of work product doctrine for documents prepared for regulatory audits and investigations).

the work product doctrine.   *Deloitte, LLP*, 610 F.3d at 136-37 (concluding that document authored by non-attorney may nonetheless contain protected work product, at least in part, if it records the attorney's mental impression or other protected work product).

Third, Plaintiffs speculate that **Document 24** is a "neutral evaluation of the law" rather than "pointed advice."  Pls' MSJ at 28.[11]  But this speculation is contradicted by the Shiner Declaration, which is bolstered by the description in the Index.  As discussed above, Document 24 is identified as "D-R-A-F-T LEGAL APPENDIX PARAGRAPHS."  This draft document was released in part, but redactions were applied to protect, *inter alia*, attorney work product created in reasonable anticipation of litigation.  The document discusses the potential legal liabilities that accompany the RDI program.  That is sufficient to meet the standard for protection under the work product doctrine.

Accordingly Defendant is entitled to summary judgment for the limited withholdings based on the attorney work product doctrine.

### V.  Plaintiffs' "Additional Issues" Are Meritless.

Plaintiffs raise three other issues.  First, they believe that there should be a signed version of Document 25, Pls' MSJ at 28, but Document 25 was the only version of this document located.

Second, Plaintiffs believe that Document 32 should have attachments, attachments that were partially quoted in the Executive Summary.  Pls' MSJ at 28.  Those attachments were processed along with the document and the pages denied in full.  The only quote purporting to be from those pages is the phrase "intelligence interrogation."  Standing alone, that phrase is meaningless and would not be deemed reasonably segregable.

---

[11] Plaintiffs cite to Document 4, but the context of the brief suggests that they may have intended to cite Document 24, which is a draft legal appendix.

Third, Plaintiffs believe that the SSCI Executive Summary quotes from portions of Document 33 that are presently redacted. Pls' MSJ at 28. But there are no quotes in Document 33 that match the language in the summary other than what has already been provided.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendant's Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment.

Dated: May 20, 2019                    Respectfully submitted,

                                       JOSEPH H. HUNT
                                       Assistant Attorney General

                                       ELIZABETH J. SHAPIRO
                                       Deputy Branch Director

                                       */s/ Amy E. Powell*
                                       AMY E. POWELL
                                       Federal Programs Branch
                                       Civil Division, Department of Justice
                                       310 New Bern Avenue, Suite 800
                                       Federal Building
                                       Raleigh, NC 27601-1461
                                       Phone: 919-856-4013
                                       Email: amy.powell@usdoj.gov
                                       *Counsel for Defendants*