**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JASON LEOPOLD, *et al.*, | |
| Plaintiffs, | Case No. 16-cv-1833 (JMC) |
| v. | |
| CENTRAL INTELLIGENCE AGENCY, | |
| Defendant. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Jason Leopold and Ryan Noah Shapiro sue the Central Intelligence Agency (CIA) under the Freedom of Information Act (FOIA). Plaintiffs seek documents that were cited in the publicly-released Executive Summary of the Senate Select Committee on Intelligence report on the CIA's rendition, interrogation, and detention program. The CIA produced hundreds of documents responsive to this request, but withheld or redacted others. Both sides now move for summary judgment. The Parties disagree over the adequacy of the CIA's search for records and the propriety of its withholding of certain records under Exemption 5 of the Act.

The Court **GRANTS** the CIA's motion in part and **DENIES** it in part. While the CIA has adequately described the searches that it conducted of the primary database at issue in the case, it has failed to adequately describe the searches it performed of other locations that documents were likely to be found and must come forward with additional information about those searches. Additionally, the Court cannot determine on this record whether the CIA had an unredacted version of the Executive Summary available to it during the search, so cannot grant summary judgment for the Agency on the issue of whether the search was inadequate for failure to consult this document. As for the CIA's Exemption 5 withholdings, the CIA has properly withheld the majority

1

of the records in dispute in this lawsuit. However, there remain a number of records for which the Court needs more details from the agency before it can decide one way or the other. As a result, the Court will **DENY** Plaintiffs' cross-motion for summary judgment, albeit without prejudice as to the searches and withholdings the Court cannot rule on at this juncture.[1]

## I.    BACKGROUND

In 2009, the Senate Select Committee on Intelligence (SSCI) began to investigate the CIA's post-9/11 detention and interrogation program. *See* S. Rep. No. 113-288, at iv (2014); *see also Connell v. CIA*, 110 F.4th 256, 261 (D.C. Cir. 2024). The program is now notorious—thanks in large part to the SSCI report—for its use of so-called "enhanced interrogation techniques," including treatment of detainees that the "Government has since concluded . . . constituted torture." *United States v. Zubaydah*, 595 U.S. 195, 200 (2022). The SSCI investigation lasted for multiple years, involved review of millions of CIA records, and resulted in the preparation of a committee report on the program (the "Full Report"), as well as an executive summary (the "Executive Summary"). S. Rep. No. 113-288, at viii. In 2012, the SSCI sent drafts of the Full Report and the Executive Summary to the Executive Branch for comment. *Id.*; *Connell*, 110 F.4th at 261. Following additional revisions, the SSCI sent a version of the Executive Summary to the President for declassification. S. Rep. No. 113-288, at iv. The declassified Executive Summary was released by the SSCI in December 2014. *See generally id.* The nearly 500-page document contains 2,725 footnotes, some of which are heavily redacted, which refer to various operational cables, intelligence reports, internal memoranda and emails, briefing materials, and other records that the SSCI reviewed in compiling the Executive Summary. *Id.* at 1–499.

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion and order, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

Plaintiffs submitted a FOIA request to the CIA seeking specific records that were "discussed in the Executive Summary" and were "identified in the footnotes of the SSCI Report." ECF 25-1 at 36. An attached index listed over 800 specific citations, organized by the footnote of the Executive Summary in which they appeared. ECF 25 at 2; ECF 26-1 ¶ 1. After the CIA failed to make a determination on the request by the statutory deadline, Plaintiffs brought suit, alleging violations of FOIA. ECF 25 at 3; *see generally* ECF 1. According to a schedule proposed by the Parties and approved by the Court, the CIA eventually produced 378 documents in whole or in part and withheld 225 documents in full. ECF 25 at 3; ECF 26-1 ¶ 2. However, the CIA stated that it was unable to locate 19 of the documents cited in SSCI Report. ECF 25 at 3.

At that point, the CIA moved for summary judgment. ECF 25. The CIA asserted that its search was adequate, and its withholdings and redactions were proper under the statute. Plaintiffs cross-moved for summary judgment and challenged the adequacy of the CIA's search and the propriety of its withholdings. ECF 27. While the CIA withheld and redacted documents under various exemptions, Plaintiffs only challenged the withholdings and redactions that are based solely on Exemption 5 of the Act, which leaves only 65 records in dispute. ECF 25 at 3; ECF 26-1 ¶ 3. During summary judgment briefing, the CIA provided additional documents, bringing the number of purportedly unlocatable records down to 11. ECF 27-4 ¶ 5; ECF 26-1 ¶ 2. The CIA also produced declarations regarding the CIA's search and a *Vaughn* index. *See, e.g.*, ECF 25-1 at 1–33; ECF 27-4. Following developments in the D.C. Circuit's FOIA caselaw, the Court ordered additional briefing from the Parties. ECF 33; ECF 34. During that briefing, the CIA filed an additional declaration. ECF 33-1.

The Court now proceeds to resolve the motions.

## II.    LEGAL STANDARD

"[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Off. of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011). "The agency is entitled to summary judgment only if it shows beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents." *Aguiar v. DEA*, 865 F.3d 730, 738 (D.C. Cir. 2017). Likewise, an "agency withholding responsive documents from a FOIA release bears the burden of proving the applicability of claimed exemptions." *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011). "Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009). "If the agency fails to provide a sufficiently detailed explanation to enable the district court to make a de novo determination of the agency's claims of exemption, the district court then has several options, including inspecting the documents in camera, requesting further affidavits, or allowing the plaintiff discovery." *Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 997 (D.C. Cir. 1998).

## III.    ANALYSIS

The Court first considers whether the agency conducted an adequate search for responsive records and determines that the CIA's declarations lack sufficient detail to establish that it has conducted an adequate search. Next, the Court reviews the CIA's withholdings and finds that it has adequately justified holding the majority of the disputed records. As for the remainder, summary judgment is premature.

### A. Adequacy of the CIA's Search

Under FOIA, agencies have "an obligation . . . to conduct an adequate search for responsive records," *Edelman v. SEC*, 172 F. Supp. 3d 133, 144 (D.D.C. 2016), and "[a]n inadequate search for records constitutes an improper withholding" under the statute, *Schoenman v. FBI*, 764 F. Supp. 2d 40, 45 (D.D.C. 2011). A search is adequate if it is "reasonably calculated to uncover all relevant documents." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999). Whether a search is adequate is not determined by its results, but by the means used to conduct it. *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003). For example, "[t]here is no requirement that an agency search every record system." *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). "However, the agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested." *Id.*; *see also DiBacco v. U.S. Army*, 795 F.3d 178, 190 (D.C. Cir. 2015).

To prove its search was adequate, the agency may rely on a "reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials . . . were searched." *Oglesby*, 920 F.2d at 68. Such affidavits are "accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991). At minimum, the affidavit must describe "what records were searched, by whom, and through what process." *Steinberg v. U.S. Dep't of Just.*, 23 F.3d 548, 552 (D.C. Cir. 1994). "Furthermore, the affidavit must explain the scope and method of the agency's search in a non-conclusory fashion." *Nat'l Sec. Couns. v. CIA*, 849 F. Supp. 2d 6, 11 (D.D.C. 2012). If an affidavit "lacks sufficient detail for the Court to determine whether the search was adequate," the Court must "deny the [agency's] motion for summary judgment." *Id.*

5

Following various rounds of searches, the CIA located over 600 documents responsive to Plaintiffs' request but was unable to locate eleven documents cited by the SSCI in the footnotes to the Executive Summary. ECF 25 at 3; ECF 27-4 ¶¶ 4–5. The CIA submitted declarations which describe the process used to identify responsive documents. First, according to Antoinette Shiner, an Information Review Officer at the CIA, the Agency first identified a database known as the "Rendition, Detention, and Interrogation Network," or "RDINet," as "the location that was reasonably likely to contain responsive records." ECF 25-1 at 4. This was because RDINet is "a central repository containing materials gathered from across the Agency detailing the former detention and interrogation program," and is also "the repository of information that was relied upon by SSCI staffers in drafting their study of the former detention and interrogation program." *Id.* To identify responsive materials, "[a]gency search experts" focused on the language in each footnote and used search "terms appearing in the document title," or "in the case of cables," used "the cable citations." ECF 25-1 at 4–5.

If the CIA's reviewers were not able to find the information in RDINet, they "conducted supplemental searches in the directorates or offices" where the document "likely originated," including the Office of Congressional Affairs, the Center for the Study of Intelligence, the Office of the Inspector General, and the Office of General Counsel. ECF 25-1 at 5; *see* ECF 26-4 at 2. These additional searches are described as "[t]argeted searches led by knowledgeable personnel in these offices." ECF 26-4 at 2–3. During the pendency of this litigation, the CIA conducted an additional search of its Counterterrorism Center and found one additional document, which the CIA provided to Plaintiffs. ECF 31 at 14.

The fact that the CIA's search failed to turn up ten documents out of the hundreds requested is not, on its own, enough to find that the search was inadequate. *See Wilbur v. CIA,* 355 F.3d 675,

678 (D.C. Cir. 2004) ("[T]he agency's failure to turn up a particular document, or mere speculation that as yet uncovered documents might exist, does not undermine the determination that the agency conducted an adequate search for the requested records."). Again, the adequacy of a search is not determined by its results, but by the means used to conduct it. *Iturralde*, 315 F.3d at 315.

But Plaintiffs do more than just point to missing documents. First, they challenge the CIA's declarations as insufficiently detailed in describing the methodology underlying its searches. To make out a *prima facie* showing of adequacy, an agency's affidavits or declarations must "specify what records were searched, by whom, and through what process." *Rodriguez v. Dep't of Def.*, 236 F. Supp. 3d 26, 35 (D.D.C. 2017). Plaintiffs' most persuasive challenge focuses on the CIA's description of its purported searches of locations outside of RDINet. Plaintiffs identify documents referred to in footnotes 28, 719, 904 and 2461, as documents that are likely to have been located in the records of the Office of Congressional Affairs and the Office of General Counsel. *See* ECF 26 at 8–10, 11–13; *see also* ECF 31 at 10–11, 13–14. The CIA appears to agree that these locations were likely to contain those, and other documents not found in RDINet, given that when the CIA was unable to find documents in RDINet, the Agency claims to have searched additional offices in which the document "likely originated," including the Office of Congressional Affairs and the Office of General Counsel. ECF 25-1 at 5. The CIA also conducted supplemental searches of the "Office of the General Counsel, Office of the Inspector General, and Office of Congressional Affairs" during the pendency of this litigation. ECF 26-4 at 2.

Plaintiffs argue that to the extent that the CIA searched other offices or directorates for missing documents, the CIA's description of the searches of these offices' records is insufficient to support summary judgment in the CIA's favor. The Court agrees. While the CIA's declarations describe the search terms used by the agency, namely the "terms appearing in the document title"

or the "cable citations," with respect to the searches of the other "offices in which the document likely originated, including" the Office of the General Counsel, Office of the Inspector General, and the Office of Congressional Affairs, ECF 25-1 at 5, the declarations fail to articulate any additional detail about the "type of search performed," *DeBrew v. Atwood*, 792 F.3d 118, 122 (D.C. Cir. 2015) (requiring that a declaration sufficiently describe "the type of search performed"); *Morley v. CIA*, 508 F.3d 1108, 1122 (D.C. Cir. 2007) (finding CIA declaration insufficient that "merely identifie[d] the three directorates that were responsible for finding responsive documents without," among other defects, "explaining how the search was conducted in each component"). In describing these searches, the declarations merely state that CIA staff "conducted supplemental searches in the[se] directorates or offices," and that these searches were "diligent." ECF 25-1 at 4–5. A declaration describing supplemental searches of these offices made during the pendency of litigation states that they were "[t]argeted searches led by knowledgeable personnel in these offices . . . for each of the remaining documents." ECF 26-4 at 2–3. Unlike with the search of RDINet, which was described as a specific, unique database queried by the CIA's search staff—a "central repository containing materials gathered from across the Agency" regarding the detention and interrogation program, ECF 25-1 at 4—these declarations "do not denote which files were searched, or by whom, do not reflect any systematic approach to document location, and do not provide information specific enough to enable the requester to challenge the procedures utilized," *Steinberg*, 23 F.3d at 552 (quoting *Weisberg v. Dep't. of Just.*, 627 F.2d 365, 371 (D.C. Cir. 1980)).

As a result, this case resembles *National Security Counselors v. CIA*, where the Agency's declarations were insufficient to make a showing of an adequate search. 849 F. Supp. 2d at 11. There, the CIA submitted affidavits describing the searches conducted of one "directorate likely to contain responsive materials," but stated only that within that directorate, Agency staff

"conducted a thorough and diligent search of relevant . . . records systems for responsive documents," and "searched a records system that contain[ed] CIA regulations as well as other IMS records systems." *Id.* The searches of the Office of Congressional Affairs and the Office of General Counsel described in this case contain less detail than those in *National Security Counselors*, in that the declarations here do not even describe what records systems existed in these offices or how they were searched. *See id.* (finding declaration inadequate for failure to identify what the "other IMS records systems were that were searched"); *see also Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 950 F. Supp. 2d 221, 231–32 (D.D.C. 2013) (finding description of search insufficient when affidavits "describe[d] searches of particular databases without explaining what those databases [we]re and the documents they contain[ed]"); *Spannaus v. CIA*, 841 F. Supp. 14, 17 (D.D.C. 1993) (finding search adequate where the "affidavits describe[d] in detail the information storage and retrieval system, the searches conducted, and why further searches would be difficult"). The lack of detail manifests in other ways. Plaintiffs posit that some of the missing documents cited were likely to exist in paper or archival form, or likely existed in the personal files of retired employees. The CIA responds to these objections by claiming that its searches of these additional offices were in fact "inclusive of the archives," and "inclusive of [the former employee's] files." ECF 29 at 9, 11. But these facts are stated in the CIA's summary judgment briefs without citation to the record, and support for these details appear nowhere in the CIA's declarations. This attempt to backfill detail through the summary judgment briefs about the nature of the searches of these offices and the types of records systems involved further highlights the deficiencies in the initial description of its search.

Because the submitted declarations do not describe, with respect to the "supplemental searches" of the "directorates or offices" outside of RDINet, ECF 25-1 at 5, "the systems of

9

records" those offices "maintain[], [or] detail[] the method of retrieving records" from those offices, "[t]he Court . . . cannot evaluate the adequacy and reasonableness of the searches," *Jefferson v. Bureau of Prisons*, No. 05-cv-848, 2006 WL 3208666, at *7 (D.D.C. Nov. 7, 2006). The Court therefore denies the CIA's motion for summary judgment on the adequacy of its search of locations outside of RDINet. *See Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990) ("If . . . the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper."). The Government "might resolve those issues either by filing a more detailed declaration or conducting a supplemental search."[2] *Nat'l Ass'n of Crim. Def. Laws. v. Fed. Bureau of Prisons*, No. 18-cv-2399, 2025 WL 3240789, at *4 n.3 (D.D.C. Nov. 20, 2025); *Aguiar*, 865 F.3d at 739. Given this disposition, Plaintiffs are also not entitled to summary judgment at this time. *See NYC Apparel FZE v. U.S. Customs & Border Prot.*, No. 04-cv-2105, 2006 WL 167833, at *8 (D.D.C. Jan. 23, 2006).

Plaintiffs raise several other arguments as to why, separate from the lack of detail for searches of non-RDINet locations, the CIA has performed an inadequate search. As a threshold matter, while Court finds the CIA's declarations insufficient as to the searches of the other offices, it finds them to be "reasonably detailed" with respect to the searches made of RDINet such that they afford a presumption of adequacy to the search of this database. *Riccardi v. U.S. Dep't of Just.*, 32 F. Supp. 3d 59, 63 (D.D.C. 2014). This is because they identify the location searched (the RDINet database) and the search terms used for documents (terms appearing in the document title or, in the case of cables, the cable citations). *See id.* Plaintiffs do not appear to challenge the CIA's

---

[2] Because the Court is requiring the CIA to provide more documentation regarding its searches, or alternatively, conduct a supplemental search, the Court need not address at this time Plaintiffs' contention that the CIA failed to search in all locations reasonably likely to identify the paper sought in footnote 131. The CIA's declaration stated that when a document was not found in RDINet, the Agency searched in "other appropriate offices," ECF 25-1 at 5, and it is possible that additional detail regarding exactly which offices were searched will resolve whether the Agency reviewed documents in any of the locations that Plaintiffs suggest should have been searched, *see* ECF 31 at 11–13. Plaintiffs may reiterate their arguments following the CIA's updated submissions, should they remain relevant.

details regarding "by whom" RDINet was searched, *Steinberg*, 23 F.3d at 552, and the Court thus finds the CIA's description adequate under "the circumstances of the case," *Weisberg v. U.S. Dep't of Just.*, 705 F.2d 1344, 1351 (D.C. Cir. 1983); *see also* ECF 25-1 at 4 (noting that CIA "search experts" conducted the searches of RDINet).

Most of Plaintiffs' objections do not raise the "substantial doubt" required to undermine this presumption that the searches of RDINet were adequate. *Valencia-Lucena*, 180 F.3d at 326. Plaintiffs seize on the CIA's statement that it was unable to find one document listed in footnote 131 because the scant details included in the citation left "the Agency with little to no information upon which to search." ECF 26-4 at 3. They read this statement as an admission that "no search was performed for this specific document." ECF 31 at 11. But Plaintiffs misconstrue this statement, which is not a concession that the CIA did not look for the document in RDINet or elsewhere. Rather, the quoted language is the CIA's proffered explanation for why its searches may not have yielded any results given the limited data the Agency's searchers had to work with. *See* ECF 26-4 at 2–3. The statement does not contradict the other statements in the declaration that the Agency conducted searches for all documents in RDINet using the search terms available to them. As for Plaintiffs' contention that the CIA should have used more targeted search terms to identify the document, described in the Executive Summary and Plaintiffs' request as "CIA paper entitled 'Abu Zubaydah,' dated March 2005," ECF 25-1 at 60; ECF 26-3 at 17, the Court disagrees. Searching with the "terms appearing in the document title," which included Abu Zubaydah's name, ECF 25-1 at 5, was "reasonably calculated to uncover" the paper regarding Abu Zubaydah. *Weisberg*, 705 F.2d at 1351.[3]

---

[3] The same goes for the document described in footnote 1943, which is titled in the footnote text as "CIA Notes (DTS #2009-2024)," and was also not found by the CIA. ECF 25-1 at 100. Plaintiffs argue that the CIA's method of searching by terms in the document's title would not be reasonably calculated to produce or identify this document,

Finally, the CIA's search failed to find documents listed in footnotes 45, 722, 1746. The CIA suggested that this failure was due to the fact that the descriptions in these footnotes of the Executive Summary were "heavily redacted." ECF 26-4 at 3. Plaintiffs argue that in the face of these redactions, the CIA was obligated to consult an unredacted copy of the Executive Summary or even the Full Report in order to identify more information about the underlying documents cited. ECF 26 at 7; ECF 31 at 8–9. In essence, Plaintiffs argue that when applied to these specific footnotes, the CIA's method of searching by the document title as described in the redacted footnote was not "reasonably calculated to uncover all relevant documents." *Aguiar*, 865 F.3d at 738.

The Court disagrees in part with the Plaintiffs. The CIA's search is not inadequate because it failed to consult the Full Report or any draft copies of the Executive Summary. As to the draft or final versions of the Full Report, Plaintiffs offer only mere speculation that these documents—which are not the same as the Executive Summary—would provide additional search term information regarding the specific footnotes in question. Further, a declaration submitted by Plaintiffs regarding the CIA's treatment of the Full Report indicates that the CIA was limited by agreement with the Committee as to the proper uses of the report and its drafts, and that internal use of the Full Report was "tightly controlled by [the] CIA" for specific internal reference purposes, including for "review[ing] the document and provid[ing] comments" during the SSCI's

---

given the generic nature of the footnote text, and argue that the CIA should have instead conducted a search by date. ECF 31 at 14. "In general, a FOIA petitioner cannot dictate the search terms for his or her FOIA request," *Bigwood v. U.S. Dep't of Def.*, 132 F. Supp. 3d 124, 140 (D.D.C. 2015), and where the "agency's search terms are reasonable, the Court will not second guess the agency regarding whether other search terms might have been superior," *Liberation Newspaper v. U.S. Dep't of State*, 80 F. Supp. 3d 137, 146–47 (D.D.C. 2015). If anything, using the terms in the footnote would have resulted in an overinclusive search, which is not in itself an indication of an inadequate search. *See Young v. U.S. Dep't of Just.*, No. 21-cv-739, 2022 WL 17668806, at *2 (D.D.C. Dec. 14, 2022) ("[B]road, overinclusive search terms would not limit the responsive records produced by the agency; indeed, they would only generate more of them.").

drafting process. ECF 26-3 at 13.[4] Given the limitations on the Full Report's use, the failure to consult the Full Report does not undermine the adequacy of the CIA's search. The same goes for the 2012 draft version of the Executive Summary, which was provided for the "limited purpose of providing comments in response to the Study." ECF 26-3 at 10.

But the case is different for the unredacted version of the Executive Summary. Recall that Plaintiffs' FOIA request sought the "specific records identified and discussed in the Executive Summary." ECF 25-1 at 36. Given the CIA's stated belief that redactions in the public Executive Summary "le[ft] the Agency few leads" regarding certain footnotes, ECF 26-4 at 3, if the Agency did have access to an unredacted version of the Executive Summary, it stands to reason that review of that version would have provided those leads, *see Kowalczyk v. Dep't of Just.*, 73 F.3d 386, 389 (D.C. Cir. 1996) (requiring an agency to follow "a lead that is both clear and certain"). In response, the CIA appears to dispute that it had access to an unredacted version of the Executive Summary to cross-reference. It claims that when it responded to Plaintiffs' FOIA request, it "consulted the version of the Executive Summary that it has"—implying that the CIA had access to only one version, the redacted document. ECF 29 at 9; *see also* ECF 26-4 at 3 (discussing only the redacted footnotes). However, the CIA cites to no record evidence for the claim that it had access to only the redacted version of the Executive Summary. On the other side of the ledger, Plaintiffs argue that the Court should infer that the CIA had access to this document. The declaration submitted by Plaintiffs from a CIA employee states that the document was sent to the President and subsequently declassified by the "Director of National Intelligence," but does not mention any role of the CIA

---

[4] Although not discussed in the record in this litigation, it appears that in early 2015, the SSCI revoked use of the Final Report entirely and sought return of the document from the Executive Branch. *Musgrave v. Warner*, No. 21-cv-2198, 2022 WL 4245489, at *2 (D.D.C. Sep. 15, 2022) (noting that, by 2022, only limited copies of the Full Report existed within the Executive Branch, with none of the locations being the CIA), *aff'd on other grounds*, 104 F.4th 355 (D.C. Cir. 2024).

13

specifically in that process. ECF 26-3 at 12. But the declaration also notes that when the SSCI sent the final version of the Executive Summary to the Executive Branch for declassification in 2014, the Executive Branch and the SSCI "had many discussions." *Id.* at 11. Although the CIA is not mentioned as part of these discussions, one inference from the declarations is that the CIA, the subject of the Report, would have received a copy of the final Executive Summary in order to provide input as it did for the draft version.[5] However, even if the CIA did have a version of the unredacted final Executive Summary, the declarations also do not make clear whether the document was available to be used for these purposes. And a countervailing inference to be drawn from the statements regarding the strict limitations on the draft Executive Summary is that the copy shared for declassification was also subject to similar limitations.

The present record lacks sufficient detail to resolve the factual dispute of whether the CIA received a version of the unredacted Executive Summary and whether it was available for the CIA to use in responding to this FOIA request. As a result, the Court will deny both sides' motions for summary judgment on the issue of whether the CIA's search was rendered inadequate by a failure to consult an unredacted version of the Executive Summary in locating the remaining documents. Here too, the CIA "might resolve those issues either by filing a more detailed declaration" regarding the availability of the unredacted Executive Summary for purposes of responding to FOIA requests "or conducting a supplemental search." *Nat'l Ass'n of Crim. Def. Laws*, 2025 WL 3240789, at *4 n.3.[6]

---

[5] The Court notes, although does not weigh as evidence in making its determination on this factual dispute, that the D.C. Circuit in a separate FOIA case regarding the Executive Summary stated that the process of declassification of the Executive Summary "involv[ed] a review by the Director of National Intelligence *and the CIA*." *Connell*, 110 F.4th at 261–62 (emphasis added).

[6] Plaintiffs also argue that the CIA's search was inadequate because it has failed to produce a signed version of document 25. ECF 26 at 34. They point to the fact that the SSCI report refers to a signed version of this document, while the version produced to Plaintiffs lacks any signatures. *See* ECF 26-3 at 25, 122. The CIA states, albeit without

## B. Records Withheld or Redacted Under FOIA Exemption 5

Separate from the adequacy of the search, the Parties also challenge the propriety of certain CIA withholdings and redactions. "In responding to a FOIA request, an agency may withhold information that falls into any of the statute's enumerated exemptions." *Hettena v. CIA*, 145 F.4th 1354, 1356 (D.C. Cir. 2025). The Parties' summary judgment motions regard 65 documents which the CIA withheld or redacted on the basis of Exemption 5, which protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption "incorporates the privileges that the Government may claim when litigating against a private party, including the governmental attorney-client and attorney work product privileges, . . . and the deliberative process privilege." *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015).

To withhold a responsive record, an agency must show both that the record falls within a FOIA exemption, 5 U.S.C. § 552(b), and that the agency "reasonably foresees that disclosure would harm an interest protected by [the] exemption," *id.* § 552(a)(8)(A)(i)(I). The D.C. Circuit has emphasized that "whether a requested record falls within an exemption and whether the disclosure of that record would foreseeably harm an interest protected by the exemption are distinct, consecutive inquiries." *Leopold v. U.S. Dep't of Just.*, 94 F.4th 33, 37 (D.C. Cir. 2024).[7]

---

citation to the record, that "Document 25 was the only version of this document located." ECF 29 at 33. Given that the Court is requiring the CIA to either supplement the record or perform an additional search, the Court will not address this argument on the present record and will consider this issue in light of the CIA's renewed submissions.

[7] *Leopold* was decided after the briefing in this case was completed, but the Court is bound to apply it and other recent precedents in deciding the current dispute. *See, e.g.*, *Rudometkin v. United States*, 140 F.4th 480 (D.C. Cir. 2025). Although the Court acknowledges that the foreseeable harm doctrine has been further explained by the D.C. Circuit since the briefing in this case was completed, the CIA has had the opportunity to try to meet the legal standard set by the D.C. Circuit in *Reporters Committee for Freedom of the Press v. FBI*, 3 F.4th 350 (D.C. Cir. 2021). That case was decided before the Parties submitted a supplemental round of briefs specifically addressing the foreseeable harm requirement, and the Parties in fact addressed *Reporters Committee* in their supplemental memoranda. *See* ECF 33; ECF 34. Moreover, the Parties' approach to the foreseeable harm analysis was consistent with the instruction in *Reporters Committee*, as reiterated in *Leopold*, that the foreseeable harm requirement is an "independent and

15

An agency "must specifically and thoughtfully consider foreseeable harm from disclosure of otherwise-exempt information, including whether partial disclosure of information is possible." *Id.* at 38. The CIA has claimed the deliberative process, attorney-client, and attorney work product privileges over these records, withholding them either in full or in part. Plaintiffs contest many of the withholdings as insufficiently supported.

The CIA has justified withholding the majority of the documents in question. However, there are a substantial number of documents for which the Court lacks sufficient detail to determine the applicability of each privilege or the existence of foreseeable harm. The Court will thus deny both Parties' summary judgment motions with respect to those records and require the CIA to provide further justifications regarding its withholdings. Should the CIA believe that it can still support Exemption 5 withholdings, it must provide supplemental declarations or *Vaughn* indices. The Parties may then move once more for summary judgment.

### 1. *Deliberative Process Privilege*

The deliberative process privilege protects from disclosure "documents reflecting advisory opinions, recommendations, and deliberations that are part of a process by which government decisions and policies are formulated." *Reps. Comm.*, 3 F.4th at 361. To invoke the privilege, the CIA must show that the documents are both "predecisional and deliberative." *Id.* at 362. "A document is predecisional if it was generated before the agency's final decision on the matter," and it is "deliberative" if it was "prepared to help the agency formulate its position" and "reflects the give-and-take of the consultative process." *Id.* The privilege thus protects records that contain information that comprises "part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975).

---

meaningful burden" considered separately from and sequentially to the issue of whether an exemption applies. *Leopold*, 94 F.4th at 38 (citing *Reps. Comm.*, 3 F.4th at 369)).

"[T]he foreseeable harm requirement applies with particular force in the context of the deliberative process privilege." *Friends of the River v. U.S. Army Corps of Eng'rs*, No. 16-cv-2327, 2023 WL 4105168, at *4 (D.D.C. June 21, 2023). It is not enough for an agency to provide a "perfunctory statement that disclosure of all the withheld information—regardless of category or substance—would jeopardize the free exchange of information." *Reps. Comm.*, 3 F.4th at 370. The agency must provide "a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." *Id.* But an agency need not provide a separate explanation for each individual record; it may take a "categorical approach," so long as the categories it defines are specific enough so that the explanation provided would "characteristically" apply to each document therein. *Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 78–79 (D.D.C. 2018); *see also Reps. Comm.*, 3 F.4th at 369. Second, in the absence of a focused and concrete agency explanation, the Court may nonetheless find that the foreseeable harm requirement is satisfied based on the "context and purpose" of the withheld information. *Reps. Comm.*, 3 F.4th at 372; *see also Reps. Comm. for Freedom of the Press v. U.S. Customs & Border Prot.*, 567 F. Supp. 3d 97, 110 (D.D.C. 2021).

The CIA has submitted declarations and a *Vaughn* index to substantiate its claims of the deliberative process privilege. ECF 25-1; ECF 33-1. In doing so, the Agency has divided the documents in question into the following broad categories: (a) Drafts, (b) Talking Points, (c) Cables, (d) Memoranda for the Record, (e) Other Internal Memoranda and Emails, and (f) Office of Inspector General Reports. Plaintiffs raise objections to the CIA's categorical approach and to the treatment of specific documents within those categories. The Court will address each in turn.

17

**(a) Drafts**

The CIA has sought to withhold documents 2, 4, 18, 20, 27, 35, 36, 44, and 55 on the grounds that they are draft documents which "reflect information at the interim stages and are associated with a given deliberation concerning how to handle different policies and/or procedures related to the former detention and interrogation program." ECF 25-1 at 7; *see* ECF 33-1 ¶ 7 (listing these documents within the draft document category).[8]

While a document's labeling as a draft may be a good indicator that the document is deliberative and predecisional, *see ACLU v. DOJ*, 655 F.3d 1, 18 (D.C. Cir. 2011), not every document "identified as a 'draft' is per se exempt," particularly where the record does not indicate the document is deliberative in nature, or if the document has been "adopted, formally or informally, as the agency position on an issue," *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257–58 (D.C. Cir. 1982).

The CIA has adequately justified withholding documents 2, 4, 18, 20, 35, 44, and 55. Review of the *Vaughn* index and declarations indicates that these draft documents were involved in predecisional deliberations regarding specific, identifiable decisionmaking processes, including regarding the use of certain interrogation techniques, phases of review of the detention program, and incarceration decisions regarding specific prisoners. ECF 25-1 at 20–21, 26, 28, 30, 32. Further, Plaintiffs do not contest the CIA's declarant's statement that each document is "a draft [that] does not reflect a final agency position." ECF 33-1 ¶ 7. Finally, Defendants have also shown that "harm is reasonably foreseeable if agency employees expect that their deliberations about" the subjects of these documents "will be publicly disclosed." *ACLU v. CIA*, No. 18-cv-2784, 2022 WL 306360, at *9 (D.D.C. Feb. 2, 2022). The CIA's declarant avers that the draft documents in this

---

[8] The CIA has also sought to withhold documents 12, 24 and 28 under this category. Because the Court finds these documents subject to withholding on other grounds, it need not address their withholding here.

set involve discussions about "intelligence techniques that inform the underlying decisions and deliberations of intelligence collection," such that "[d]isclosure of [these] drafts would quiet candid, robust discussion of future intelligence techniques and methodologies, thereby adversely impacting intelligence collection." ECF 33-1 ¶ 7. Given that the record supports the CIA's description of these documents as "draft documents that lay out various recommendations and proposals" regarding intelligence techniques, the Court agrees that disclosure of these documents "'would discourage candid discussion within the agency'" about this subject and that the CIA has properly applied Exemption 5 to these documents. *Arab Am. Inst. v. Off. of Mgmt. & Budget*, No. 18-cv-0871, 2020 WL 4698098, at *7 (D.D.C. Aug. 13, 2020) (quoting *Access Reports v. U.S. Dep't of Justice*, 926 F.2d 1192, 1195 (D.C. Cir. 1991)).

However, the CIA's *Vaughn* index and declarations do not provide enough information to determine whether documents 27 and 36 are predecisional or deliberative. As for document 36, which is described merely as a "draft document to be used as an outline for potential briefing," ECF 25-1 at 28, the index or supporting declaration provides no further details as to the subject of that briefing—the "specific deliberative process"—nor does it articulate the "function and significance of the document in that process." *Hunton & Williams LLP v. U.S. Env't Prot. Agency*, 248 F. Supp. 3d 220, 241 (D.D.C. 2017). While it is true that "[a]ll drafts are in some sense deliberative; there must be more detail provided regarding the actual decisionmaking process and authority." *Stonehill v. U.S. Dep't of Just. Tax Div.*, No. 19-cv-3770, 2022 WL 407145, at *21 (D.D.C. Feb. 10, 2022). The record lacks sufficient detail regarding this document, so the Court cannot determine "what the deliberative process[]" at issue was, "much less whether the privilege applies." *Id.* For example, the Court cannot determine whether the draft briefing notes were prepared to "assist an agency decisionmaker in arriving at [a] decision," in which case they would

19

be covered by the privilege, or if the purpose of the briefing was to "explain decisions already made." *Advancement Project v. U.S. Dep't of Homeland Sec.*, 549 F. Supp. 3d 128, 141 (D.D.C. 2021). The same holds for document 27, which is described as a "draft document requesting comments/edits pursuant to the attorney-client privilege and the deliberative process privilege for deliberations regarding a draft document." ECF 25-1 at 27. To the extent that the CIA seeks to protect this document under the deliberative process privilege independent of the attorney-client privilege, the information provided in the *Vaughn* index is insufficient as to the specific decisionmaking process to which the document pertained. *See Heartland All. for Hum. Needs & Hum. Rts. v. U.S. Dep't of Homeland Sec.*, 291 F. Supp. 3d 69, 80 (D.D.C. 2018) ("The fact that the documents are drafts and contain edits does not, alone, qualify them for protection under the deliberative process privilege: they must be part of an articulated decision-making process."). The CIA must therefore provide additional detail regarding these documents.

**(b) Talking Points**

The CIA has also withheld documents 20, 26, 35, 48, 49, 51, 58, 62, and 65 as "write-ups of talking points or draft talkers to be used in meetings with senior U.S. officials, including the White House." ECF 25-1 at 9; *see* ECF 33-1 ¶ 9 (listing these documents). The Court has already found that documents 20 and 35 were properly withheld in its discussion of draft documents and will not discuss them here. As for the others, the CIA has met its burden to invoke the deliberative process privilege.

The *Vaughn* index and declarations establish that all these talking point documents "make recommendations or express opinions on legal or policy matters" and, contrary to Plaintiffs' views, do not merely regard "transmitting information between and among agencies." *Mayer, Brown, Rowe & Maw LLP v. IRS*, 537 F. Supp. 2d 128, 139 (D.D.C. 2008), *aff'd sub nom.*, *Mayer Brown*

*LLP v. IRS*, 562 F.3d 1190 (D.C. Cir. 2009); *see, e.g.*, ECF 33-1 ¶ 9 (declarant describing document 26 as talking points prepared "for the Deputy Director of the CIA in response to a briefing request from the Assistant to the President for National Security Affairs on the future of the program"). The documents were "pre-decisional, inasmuch as they preceded . . . meetings with President" Bush and other senior administration officials, and they were "deliberative because they reflect consultative processes" and the "drafter's opinions on" subjects that were to be presented to those officials. *Advancement Project v. U.S. Dep't of Homeland Sec.*, No. 19-cv-52, 2022 WL 4094061, at *5 (D.D.C. Sep. 7, 2022); *see Khatchadourian v. Def. Intel. Agency*, 597 F. Supp. 3d 96, 118 (D.D.C. 2022) (finding that "talking points created for internal briefing meetings, not public adoption," were "predecisional and deliberative").

The CIA also identifies harms that would result from the release of these documents, in that the talking points "are an important part of preparation and conduct of the interagency meetings in which important policies are discussed," and disclosure "would make it less likely that future preparers of talking points for sensitive intelligence matters will be as candid and forthcoming in making assessments and recommendations." ECF 33-1 ¶ 9. Plaintiffs concede that these harms are sufficient to justify withholding, ECF 34 at 2, and the Court agrees, *see Campaign Legal Ctr. v. U.S. Dep't of Just.*, 34 F.4th 14, 23 (D.C. Cir. 2022) ("[T]he privilege is designed to improve governmental decisionmaking by encouraging public servants to speak candidly with one another and to fully flesh out the reasons for and against potential agency actions before they are taken.").[9]

The Court grants summary judgment to the CIA regarding these withholdings.

---

[9] The Court notes that document 65 was not included in the *Vaughn* index. *See* ECF 25-1 at 33. However, it was described in the CIA's declarations, and the Court has found these descriptions sufficient to support withholding. *See* ECF 33-1 ¶ 9.

**(c) Cables**

The CIA has also withheld documents 3, 19, 29, 34, 37, 38, and 57 on the grounds that they are cables either written by "field-based Agency employees seeking Headquarters approval for particular proposed actions[] or from Headquarters to field-based employees providing suggestions and assessments to be used in a subsequent final decision." ECF 33-1 ¶ 10. The Agency avers that "[n]one of these documents reflect a final Agency position and all contain internal suggestions and recommendations." *Id.*

To start, the record does not contain enough information to determine whether summary judgment can be granted as to document 38, given that the only individualized description of the document in the record is the *Vaughn* index's vague statement that it is a "[d]raft seeking headquarters concurrence before final approval." ECF 25-1 at 28. This lack of detail leaves the Court unable to evaluate whether the document is truly predecisional and deliberative or the CIA's claim of foreseeable harm with respect to the release of this document.

As for the other documents, the *Vaughn* index, declarations, and review of unredacted versions of the documents indicate that, on first blush, they all regard detainee interrogations in ways that indicate they are predecisional and deliberative. Documents 19, 29, and 37 involve requests from subordinates for headquarters feedback regarding issues or next steps in the interrogations. *See* ECF 25-1 at 26–27 (index entries); *id.* at 10 (declarant describing document 37); ECF 26-3 at 113 (redacted version of document 19, which indicates it was sent to the "immediate ALEC info director"); S. Rep. No. 113-288, at 17, 21 (describing ALEC Station as "the office within the CIA with specific responsibility for al-Qa'ida," located at CIA Headquarters); ECF 28-2 at 1 (redacted version of document 29, which "request[s] HQS concurrence with" an interrogation-specific "program plan"). Document 34 is a cable which

22

includes "recommendations for a proposed interrogation plan pending final approval." ECF 25-1 at 28. Document 57, dated to September 10, 2002, and withheld in full, regards a "meeting with HPSCI"[10] regarding "the status of the Abu Zubaydah Interrogations," where Exemption 5 was applied to protect "details of the meeting, . . . which reflect the decision making process, legal advice, and analysis of matters under consideration." *Id.* at 32. Plaintiffs' specific objections to the application of the privilege to document 19, on the ground that some of the *unredacted* language in the document speaks in authoritative language, and their claim that document 29 was over-redacted are based on mere speculation and contrary to record evidence. *See* ECF 26 at 18.

Document 3 is a closer call. The *Vaughn* index describes this document, which was produced with redactions, and reprocessed and produced with remaining redactions during the pendency of this litigation, *see* ECF 28-1, as one which contains "pre-decisional intra-agency deliberations and withholds in full . . . assessments regarding the RDI program that, at the time, were still being considered by the Agency in anticipation of a final policy[]. . . regarding ongoing interrogations," ECF 25-1 at 21. Unlike several of the other cables, this one was sent from "Agency employees at Headquarters to personnel in the field." *Id.* at 10. Plaintiffs argue that the authorship of the cable (superior to subordinate) indicates that the document is not predecisional or deliberative. It is true that "a document from a subordinate to a superior official is more likely to be predecisional, while a document moving in the opposite direction is more likely to contain instructions to staff explaining the reasons for a decision already made." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980). But "more likely," *id.*, does not mean always. The key question is whether the document was "prepared in order to assist an agency

---

[10] Presumably the House Permanent Select Committee on Intelligence. *See* S. Rep. No. 113-288, at 438 (noting that "[i]n early September 2002, the CIA briefed the House Permanent Select Committee on Intelligence (HPSCI) leadership about the CIA's enhanced interrogation techniques").

23

decisionmaker in arriving at [a] decision" and "reflects the give-and-take of the consultative process." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992). Here, the CIA's declarant asserts that despite the fact that this cable was sent from superior to subordinate, it is predecisional and deliberative because the cable "provides preliminary input in advance of a final decision from Headquarters as to how to conduct the next phase of an interrogation and requests additional information from employees in the field for the purpose of making a final decision." ECF 25-1 at 10. A document from a superior which requests more information and feedback from a subordinate in order to inform the decisionmaking process falls within this category, given that it reflects the "give-and-take of the consultative process." *Petroleum Info. Corp.*, 976 F.2d at 1434. Plaintiffs also argue that the unredacted text in the document speaks authoritatively and does not indicate that the cable is seeking feedback or information from the recipients to inform decisionmaking. But this again assumes that the unredacted content and the redacted content are necessarily of the same character. The fact that the CIA has left certain segregable material unredacted supports its claim that it has sought to withhold only those portions of the document which are deliberative and predecisional. *See* ECF 28-1 at 4.

Finally, Plaintiffs argue that the cables should be reviewed *in camera* because there are indications that portions of the cables "embody the agency's effective law and policy" and are therefore not subject to withholding under the deliberative process privilege. ECF 26 at 18–19. Plaintiffs cite to a decision from the Southern District of New York (SDNY) which reviewed a cable similar to document 3 *in camera* and found that portions of the cable "provide[d] directions to employees in the field," which was intended to have "operative effect." *ACLU v. Dep't of Def.*, No. 15-cv-9317, 2017 WL 4326524, at *9 (S.D.N.Y. Sep. 27, 2017). The SDNY court ordered

specific redactions removed based on those determinations. *Id.* Following that decision, the CIA produced a version of document 3 in this litigation consistent with those redactions. *See* ECF 28 at 17, 18 n.3. Plaintiffs do not challenge the present version of document 3 on these grounds but argue that the CIA "has not disclosed similar material from document 19 or any other cable." ECF 31 at 22. They argue that this Court should either review the cables *in camera*, or that the CIA should "review[] all similar documents at issue in this case in light of the court's rationale for ordering disclosure in the *ACLU* case." *Id.*

The Court will choose the latter, but only for specific documents. The *ACLU v. Dep't of Defense* case found the CIA's original redactions improper because the passages represented guidance from headquarters to subordinates "intended to have operative effect." 2017 WL 4326524 at *9. Here, the only document that is clearly sent from CIA headquarters to agents in the field is document 3. Other documents, such as documents 19, 29, and 37, bear indicia of being sent from employees to headquarters, and it is thus unlikely that they contain guidance intended to have operative effect. However, the record is not clear whether documents 34 or 57 were sent from headquarters to employees in the field, or *vice versa*. The Court thus lacks sufficient information to determine whether these cables have improperly withheld the agency's "effective law and policy" and cannot decide the issue of their withholding. *Elec. Frontier Found. v. U.S. Dep't of Just.*, 739 F.3d 1, 7 (D.C. Cir. 2014). In providing additional information regarding these documents, the CIA shall review the cables to determine whether they contain any authoritative, binding instructions and represent guidance intended to have operative effect or represent the agency's effective law and policy, and if so, produce relevant portions.

As for documents 3, 19, 29, and 37, for which the CIA has successfully invoked the deliberative process privilege, the Agency has also met the foreseeable harm requirement. The

25

CIA's declarant states that production of the withheld or redacted material would "chill the future use of such cables to make suggestions and recommendations regarding sensitive intelligence techniques," which would "thus inhibit candid discussion among Agency officers on future intelligence techniques, methodologies, and use cases." ECF 33-1 ¶ 10. All these documents regard decisionmaking about pending interrogations, which even Plaintiffs agree are "intelligence-gathering technique[s]." ECF 34 at 5. On this record, the CIA has established a "reasonably foreseeable link between these harms and the specific information contained in the withheld records." *Ctr. for Investigative Reporting v. U.S. Dep't of the Interior*, 613 F. Supp. 3d 327, 335 (D.D.C. 2020).

While the Court determines that it lacks, at present, sufficient information to decide the withholding status of documents 34, 38, and 57, the CIA has properly met its burden to withhold or redact documents 3, 19, 29, and 37, and accordingly will grant summary judgment to the CIA on these documents and deny it to Plaintiffs.

### (d) Memoranda for the Record

The CIA has also withheld documents 11, 39–43, 45–47, 50, 52–54, 56, and 60 on the grounds that they are "responsive memoranda for the record (MFR) describing discussions of policy options during Congressional briefings and meetings with the National Security Council." ECF 33-1 ¶ 8. According to the CIA's declarant, "[e]ach MFR reflects CIA impressions, analysis, and opinions; and memorializes discussions and interactions with key U.S. policy makers, including the selection and arrangement of factual material relevant to the Agency's decision-making processes." *Id.*

The Court agrees with CIA's withholding decisions in part. Documents 11, 43, 47, 52–54, and 60, have properly been withheld under the deliberative process privilege. Plaintiffs do not raise

26

specific objections to the application of the deliberative process privilege to these documents, while they have done so for other memoranda for the record in this category. The *Vaughn* index, along with the CIA's declarations, indicate that these memoranda contain descriptions of internal meetings at the CIA or with National Security Counsel or White House officials, as well as CIA analysis or impressions of those meetings. "Purely factual material usually cannot be withheld under Exemption 5 unless it reflects an exercise of discretion and judgment calls." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011). "Thus the legitimacy of withholding does not turn on whether the material is purely factual in nature or whether it is already in the public domain, but rather on whether the selection or organization of facts is part of an agency's deliberative process." *Id.* Here, the descriptions in the *Vaughn* index support the finding that these memoranda were produced to "promote deliberation" as to specific, identifiable agency decisions under consideration, *Elec. Priv. Info. Ctr. v. Transp. Sec. Admin.*, 928 F. Supp. 2d 156, 167 (D.D.C. 2013), and reflected the selection of factual material "for the benefit of . . . official[s] called upon to take discretionary action," *Mapother v. Dep't of Just.*, 3 F.3d 1533, 1539 (D.C. Cir. 1993). Plaintiffs also do not dispute that, in the case that the Court finds any of the memoranda in this category to be subject to the deliberative process privilege, the CIA has met is burden for showing foreseeable harm. The Court agrees, given that disclosure of these documents would harm future discussions "between senior policy makers on national security issues of critical importance." ECF 34 at 2–3 (admitting that if Defendant's memoranda for the record are "subject to the deliberative process privilege, the CIA has shown foreseeable harm").

On the other hand, Plaintiffs challenge the application of the deliberative process privilege to documents 39–42, 45–46, 50, and 56. The *Vaughn* index describes these documents—in near identical language—as "internal memorand[a]" created to "memorialize discussions and

27

interactions with Congress, where those discussions could serve as a basis for future Agency decision making." ECF 25-1 at 29–32. With one exception, the Court is unable to decide at this stage whether these documents have been properly withheld under the deliberative process privilege.

Unlike the prior set of memoranda, which the *Vaughn* index states contained analysis, opinions, or contributed to specific decisionmaking processes, the descriptions of the memoranda indicate that they are primarily factual, in that they "memorialize discussions and interactions with Congress." ECF 25-1 at 29–32. Again, material that is "purely factual in nature" could nevertheless be subject to withholding when the record demonstrates that the "selection or organization of facts is part of an agency's deliberative process." *Ancient Coin Collectors Guild*, 641 F.3d at 513. But here, the CIA has not explained what "*definable* decision-making process[es]" were underway when these memoranda were compiled or to what processes they were intended to contribute. *100Reporters LLC v. U.S. Dep't of Just.*, 248 F. Supp. 3d 115, 151 (D.D.C. 2017). The sole exception is document 39, which is titled "Destruction of Detainee Videotapes," and which the CIA's supplemental declaration states "summarizes a briefing regarding the destruction of certain videos" and reflects CIA employees' "internal impressions and the selection of facts they thought potentially relevant to future similar decision-making and future interactions with Congress." ECF 25-1 at 29; ECF 33-1 ¶ 8. The deliberative process privilege has been held to cover agency determinations about "how to respond to Congress," *Bloche v. Dep't of Def.*, 370 F. Supp. 3d 40, 52 (D.D.C. 2019), and with respect to document 39, the *Vaughn* index and declarations provides some indication about the subject of the briefing to Congress—the ongoing public controversy over the CIA's destruction of videotapes of detainee interrogations. ECF 25-1 at 29; ECF 33-1 ¶ 8; *see also* S. Rep. No. 113-288, at 451–52 (describing the controversy and noting that a briefing on

28

the subject occurred on December 11, 2007, also the date of this memorandum). This controversy continued and was in part the inspiration for the SSCI review of the CIA's detention program. S. Rep. No. 113-288, at 8. The context provided regarding this document is sufficient to support the CIA's withholding, given that the CIA reasonably anticipated further "determinations about how to respond to . . . Congress" regarding that subject. *Bloche*, 370 F. Supp. 3d at 52. The same is not true for the other documents in this subset, which lack any additional details about the subject of the briefing, and for which the Court cannot "make a *de novo* determination" either way of whether they are covered by the deliberative process privilege. *100Reporters LLC*, 248 F. Supp. 3d at 154. Because the Court is already giving the CIA an additional opportunity to supplement the record in this case, it will afford the Government an opportunity to "supplement[]" the record with respect to documents 40–42, 45–46, 50, and 56, rather than compelling production at this time. *Id.*

### (e) Other Internal Memoranda and Emails

The CIA describes documents 5–6, 9–10, 13–17, 21–23, 25, 31–33, 59, 63, and 64 as "internal memoranda and emails" that contain "descriptions of potential plans, recommendations, operational proposals, and assessments on aspects of the RDI program."[11] ECF 25-1 at 10, 12. Plaintiffs raise specific objections to the application of the deliberative process privilege to documents 5, 6, and 10. *See* ECF 26 at 20–30; ECF 31 at 24–29.

Document 5, which has been released in redacted form, is a memorandum from the Chief of the CIA's Information Operations Center to the Deputy Director for Operations which provides an "informal operation assessment of the CIA Detainee program." ECF 26-3 at 83–84. The CIA

---

[11] The CIA also includes the withholdings or redactions of Documents 4, 11, 18, 20, 28, 43, 52, 58, and 65 in this category. ECF 33-1 ¶ 11. These withholdings are justified on other grounds and therefore need not be addressed in this section.

states that redactions have been made to preserve "internal recommendations and opinions" related to the review. ECF 25-1 at 22; *see also* ECF 33-1 ¶ 11. Plaintiffs claim that these redactions are suspect and insufficiently supported, particularly given that the agency has left unredacted parts of the memorandum that offer recommendations and opinions. *See* ECF 26-3 at 84 (recommending that "[t]he Directorate of Operations (DO) should not be in the business of running prisons or temporary detention facilities"). But the agency "does not forfeit the benefit of a FOIA exemption simply because" it has decided "to voluntarily release other similar information." *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 464 (D.C. Cir. 2014) ("Indeed, penalizing agencies in that way would discourage them from voluntarily releasing information, which would thwart the broader objective of transparent and open government."), *abrogated by statute on other grounds by* 5 U.S.C. § 552(b)(5). The *Vaughn* index, the declarations, and review of the redacted copy of the document all supports the CIA's claims that the redactions were for predecisional and deliberative content.

The CIA has also shown foreseeable harm for the release of the redacted portions of the document, given that its declarant specifically discusses the content of this document and the related deliberations, and states that "[d]isclosure of such deliberations would quiet robust discussion on future intelligence techniques, methodologies, and use cases." ECF 33-1 ¶; *see also Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020) (finding foreseeable harm shown when agency "specifically focused on the information at issue" in the record and "concluded that disclosure of that information would chill future internal discussions"). Plaintiffs argue that the CIA's claims of foreseeable harm are undercut by the fact that the redacted version of the document has revealed certain predecisional deliberative content. But this assumes—resting on mere speculation—that the withheld predecisional content is similar in nature to the content

that has been released. The very fact that some deliberative content was produced while some was redacted supports the CIA's claim that the Agency considered the relative harmfulness of releasing the information when making redactions. The withholding of document 5 is sufficiently justified.

Document 6, which has been produced with redactions, is a memorandum from the Director of Central Intelligence to the National Security Advisor regarding the effectiveness of interrogation techniques. ECF 26-3 at 86–90. The *Vaughn* index states that Exemption 5 redactions have been made to sections containing "assessments and recommendations for the National Security Advisor to assist in determining the effectiveness of the interrogation techniques" used in the RDI program. ECF 25-1 at 22.[12] None of Plaintiffs' objections to the withholding of this document are persuasive. First, the Court rejects Plaintiffs' claim that the deliberative process privilege cannot apply to a memoranda from agency officials to White House officials because the document concerned "White House deliberations" rather than "CIA deliberations." ECF 31 at 27. Exemption 5 protects "inter-agency memoranda or letters that were used in the decisionmaking processes of the Executive Branch," and applies to "documents prepared by agency officials to advise the President," as well as documents "shared with or received from" Executive Branch officials whose role it is to "advise" the President, like the National Security Advisor. *Jud. Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 129–31 (D.C. Cir. 2005). Second, the Court is unpersuaded that the CIA's disclosure of a different memorandum with similar language, including unredacted language that does not appear in document 6, indicates that document 6 has been improperly redacted. *Compare* ECF 26-3 at 86–90, *with id.* at 143–47. While the structure of the memoranda and the *unredacted* content are strikingly similar, these documents were written by different authors and sent to different recipients, for different purposes, and do not necessarily undermine

---

[12] Document 6 also contains redactions made on the basis of the attorney work product privilege, which the Court addresses separately below. *See infra* Section III.B.3.

the CIA's claim that the *redacted* content in these documents is different. *Compare id.* at 26-3 at 87 (responding to request "for an independent study of the foreign intelligence efficacy of using enhanced interrogation techniques"), *with id.* at 143 (responding to request "for the intelligence the Agency obtained from detainees").

The CIA has demonstrated foreseeable harm as to document 6, given that it involves discussions of "intelligence techniques" between a "senior Agency leader[]" and another high-up Executive branch official. ECF 33-1 ¶ 11. Like with document 5, the CIA asserts that disclosure of such deliberations would quiet robust discussion on this specific subject. *See Machado Amadis*, 971 F.3d at 371 (by "specifically focus[ing] on the information at issue" in the documents and the "chill[ed] future internal discussions" that would result, the agency "correctly understood the governing legal requirement"). Again, the fact that the CIA has released a similar (but not identical) document does not undercut the claim that foreseeable harm would result from the release of document 6, given that this rests on speculation that the unredacted sections of document 6 are similar or identical to those previously released.

As for document 10, it is a heavily-redacted memorandum from the General Counsel of the CIA to the Deputy Director of Central Intelligence regarding a proposed response to a letter received by the Agency from Human Rights Watch. *See* ECF 26-3 at 109–11. According to the CIA's declarant, the document is "pre-decisional and deliberative because it is a recommendation from the General Counsel to a senior Agency official . . . which shows the author's initial thought processes." ECF 25-1 at 11. The Court finds that this record, described as an "unfinished[] draft of a letter," *id.*, falls under the deliberative process privilege, *see Am. Ctr. for L. & Just. v. U.S. Dep't of Just.*, 325 F. Supp. 3d 162, 171–72 (D.D.C. 2018) ("[T]he overwhelming consensus among judges in this District is that the privilege protects agency deliberations about public

statements."); *see also Judge Rotenberg Educ. Ctr., Inc. v. U.S. Food & Drug Admin.*, 376 F. Supp. 3d 47, 70 (D.D.C. 2019) (finding "draft letters to the United Nations" to be predecisional and deliberative where the drafts "contain[ed] comments from government employees suggesting certain changes to the draft letter before it [was] finalized" and the *Vaughn* index "explain[ed] that the letter was subsequently finalized"). The CIA has also demonstrated foreseeable harm as to its disclosure, because it reflects "agency deliberations about public statements," the disclosure of which "would frustrate an agency's ability to prepare the way it presents information to the public." *Avila v. U.S. Dep't of State*, No. 17-cv-2685, 2022 WL 2104483, at *12 (D.D.C. June 10, 2022). Finally, the Court rejects Plaintiffs' claim that the CIA has withheld segregable information. *See Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y*, 161 F. Supp. 3d 120, 132 (D.D.C.) (declining to order defendant to "segregate the factual portions of [letter] drafts, as distinct from their deliberative portions," because doing so would "run the risk of revealing editorial judgments—for example, decisions to insert or delete material or to change a draft's focus or emphasis"), *modified on other grounds*, 185 F. Supp. 3d 26 (D.D.C. 2016).

As for documents 9, 13–17, 21–23, 25, 31–33, 59, and 63–64, Plaintiffs do not raise any specific objections about whether these documents are predecisional or deliberative. However, Plaintiffs do object in general to the CIA's use of "conclusory" descriptions in the *Vaughn* index and declarations, and argue that in many cases, the CIA has failed to provide sufficient information for the Court to determine the applicability of the privilege. ECF 26 at 14–15. The Court agrees with Plaintiffs that mere reference to ongoing review of the RDI program is not necessarily a sufficient basis, alone, to withhold a given document as predecisional and deliberative. While the agency "is not required to link each document to a specific action, it must . . . tie the materials to some definable process." *100Reporters LLC*, 248 F. Supp. 3d at 153. And courts have rejected

vague and overbroad definitions of the relevant decisional process when accepting the agency's "view of the deliberative process at issue would create a [multi]-year umbrella effectively shielding all agency action from review without accounting for any subsidiary agency decisions." *Id.* But having reviewed the descriptions provided in the *Vaughn* index and declarations, the Court determines that for almost all of the documents in this set, the CIA has done enough "to tie the materials to some definable decision-making processes such that the Court can be confident the records are predecisional and deliberative," *Nat'l Ass'n of Crim. Def. Laws.*, 2025 WL 3240789, at \*14, and that the records contributed to "subsidiary agency decisions" regarding specific aspects of the RDI program, such as the use of interrogation techniques, disciplinary decisions, interstitial phases of review of the RDI program, and incarceration decisions regarding specific prisoners, *100Reporters LLC*, 248 F. Supp. 3d at 153.

There are several exceptions. The descriptions of documents 21, 22, and 23, which have been withheld in full, are short, vague, and provide insufficient detail as to what deliberative process is at stake and what role the document played in that process. *See* ECF 25-1 at 26–27. The same goes for document 64, which does not appear in the *Vaughn* index provided to the Court. *See* ECF 25-1 at 33 (*Vaughn* index ending with entry for document 63). The description of the email in the CIA's declaration, which describes it merely as an email that "reflects inter-agency deliberations concerning information sharing," ECF 33-1 ¶ 11, also provides insufficient detail to understand whether the privilege applies.

But even for the documents that are protected by the deliberative process privilege, the CIA must still demonstrate foreseeable harm. The entries in the *Vaughn* index are somewhat thin on the subject. Instead, the CIA relies on declarations which purport to address the harms applicable to all the documents in the category of "internal memoranda and emails." ECF 33-1 ¶ 11. The CIA

34

claims that all the documents in this set "contain[] descriptions of potential plans, recommendations, operational proposals, and deliberative assessments pertaining to aspects of the former program, including the methods employed," which were "communicated to senior Agency leaders to help inform their decision-making process." ECF 33-1 ¶ 11. In the CIA's view, the disclosure of these documents would "quiet robust discussion on future intelligence techniques, methodologies, and use cases, therefore directly impacting intelligence collection." *Id.*

The CIA's categorical approach can justify some but not all of the withholdings here. Again, an agency is "permitted to group documents and address foreseeable harm 'on a category-by-category basis rather than a document-by-document basis,'" as the CIA has done here. *Levin v. Nat'l Highway Traffic Safety Admin.*, No. 20-cv-3236, 2026 WL 523017, at *5 (D.D.C. Feb. 25, 2026) (quoting *Reps. Comm.*, 3 F.4th at 369). Even in situations where the declarations are insufficient, the "context and purpose" of the records, "their subject matter," and the "sensitivity of the context in which [the documents] arose" can make the "foreseeability of harm manifest." *Reps. Comm.*, 3 F.4th at 372; *Rudometkin v. United States*, 140 F.4th 480, 493 (D.C. Cir. 2025). Based on the descriptions in the *Vaughn* index, documents 9, 13–15, 25, and 32–33 appear to discuss specific intelligence techniques, methodologies, and use cases, such as detention and interrogation methods, and specific intelligence-gathering operations. As a result, the CIA has done more than make "generalized assertions that disclosure could chill deliberations" with regard to these documents, but instead has "focused on the information at issue" in this subset of documents and "concluded that disclosure of that information would chill future internal discussions." *Machado Amadis*, 971 F.3d at 371. This is sufficient to meet the governing legal requirement and justify withholding of these documents. *See id.*

35

As for documents 16–17, 31, 59, and 63, the descriptions provided in the *Vaughn* index are insufficient for the Court to determine whether they, too, fall into the category of documents for which the CIA has articulated a specific enough foreseeable harm. For example, it is not clear that document 16, which is described as the "Report and Recommendations of the Special Accountability Board Regarding the Death of Afghan Detainee Gul Rahman," and regarded "recommendations and opinions . . . to be used in making a final decision regarding disciplinary actions," ECF 25-1 at 25, is a document which regards "intelligence techniques, methodologies, and use cases," such that the disclosure of the document would chill future discussion of these subjects, ECF 33-1 ¶ 11. And the descriptions of documents 17, 31, 59, and 63 are either so vague or described at such a high level of generality that it is difficult for the Court to see how the CIA has made a "link between the specified harm" articulated in the declaration "and the specific information contained in the material withheld." *Reps. Comm.*, 3 F.4th at 371. Nor, given the lack of detail, can the Court determine that the material is of such "unique sensitivity" that "the foreseeability of harm [is] manifest." *Id.* at 372.

The Court thus determines that it lacks sufficient detail to rule on the withholdings of documents 16–17, 21–23, 31, 59, 63, and 64. Again, where, as here, "the record includes deficient declarations," the Court will "request that the agency supplement its supporting declarations instead of ordering discovery or the submission of documents for in camera review." *Isiwele v. U.S. Dep't of Health & Hum. Servs.*, 85 F. Supp. 3d 337, 344 (D.D.C. 2015).

**(f)  Office of Inspector General Reports**

The CIA's final category of withholdings under the deliberate process privilege refer to the redactions and withholdings of various CIA Office of Inspector General (OIG) reports. Document 1 is an OIG report on "Counterterrorism Detention and Interrogation Activities" from September

2001 to October 2003. ECF 25-1 at 20. The *Vaughn* index notes that certain redactions have been made pursuant to Exemption 5 in order to protect "considerations and recommendations for improving the detention and interrogations activities/policies," including "various options for the disposition of detainees." *Id.* Per the CIA, "these options were in the deliberation phase working toward a final solution." *Id.* Document 7 is an OIG report regarding the death of a detainee, which contains redactions based on "proposed recommendations made to OGC attorneys" and "redactions of recommendations that were deliberative and provided to form a final policy."[13] *Id.* at 23. Document 12, which was withheld in full, is described as a "draft memorandum of OIG special review containing handwritten notes, to incorporate edits and ideas into a final version" *Id.* at 24.

Plaintiffs do not challenge the deliberative or predecisional nature of these documents (or the deliberative redactions within them). The Court determines that they are indeed deliberative and predecisional, given that "[e]ach of the documents reports on the findings of some investigation or analysis, and" according to the *Vaughn* index and declarations, "contains evaluations, opinions, and recommendations from one set of CIA officers to another." *ACLU v. CIA*, 892 F. Supp. 2d 234, 250 (D.D.C. 2012) (finding similar OIG reports predecisional and deliberative, "even though [the CIA's declarant] d[id] not pinpoint any particular decision or policy the reports contributed to," because the declarant "indicate[d] that they were part of an intra-agency-evaluation process[] and that they were used to determine whether or not the agency should take some administrative action").

However, with respect to document 1, Plaintiffs argue that certain redacted recommendations in the report, even if deliberative and predecisional, should be released because

---

[13] Documents 1 and 7 also have specific redactions made on the basis of the attorney-client privilege which the Court addresses separately below. *See infra* Section III.B.2.

they have likely been adopted by the CIA "as a result of the OIG report." ECF 26 at 20. Indeed, "a document can lose its predecisional character—and the protections of the privilege—if an agency adopts the document as its own" by "mak[ing] an 'express' choice to use a deliberative document as a source of agency guidance." *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017) (quoting *Sears*, 421 U.S. at 161). But Plaintiffs have not presented sufficient evidence that this has happened here. For support, they point to a statement made by the CIA in a 2014 response to the SSCI report that the CIA made various "significant improvements" to the RDI program following the "2004 IG *Special Review*." ECF 26-3 at 141. Plaintiffs also highlight the CIA's failure at summary judgment to dispute the statement that it "adopted several recommendations in the OIG report 'in response to' the report." ECF 27-1 ¶ 3; ECF 29-3 ¶ 3. But acknowledging that specific improvements were adopted in response to a deliberative document is not the same as saying that the agency adopted the position and reasoning in the document as its own. "[V]ague or equivocal statements implying that position presented in a deliberative document has merit," such as those in the response to the SSCI report, are not sufficient to demonstrate adoption. *Jud. Watch, Inc.*, 847 F.3d at 739; *see also Nat'l Council of La Raza v. Dep't of Just.*, 411 F.3d 350, 358 (2d Cir. 2005) ("Mere reliance on a document's conclusions does not necessarily involve reliance on a document's analysis; both will ordinarily be needed before a court may properly find adoption or incorporation by reference."). The record does not reflect that the CIA has expressly adopted the recommendations in the report such that they are no longer subject to the privilege.

Finally, the CIA has demonstrated foreseeable harm from the release of the full documents.[14] The CIA's declarant asserts that the OIG reports discuss "recommendations the OIG

---

[14] Plaintiffs do not challenge the existence of foreseeable harm as to document 12. ECF 34 at 7.

made in connection with the former program, as well as some deliberative information that the OIG considered in developing the report," and states that "[d]isclosure of such internal deliberations would quiet frank discussion on future intelligence program audits and reviews, therefore impacting intelligence collection and methodology." ECF 33-1 ¶ 12. The declarant focuses on the role of the OIG specifically, noting that the "effectiveness of the OIG's oversight depends on the very types of rigorous and candid discussion protected by the privilege." *Id.* More generally, the declarant asserts that revealing the "withheld information in" all the documents subject to the deliberative process privilege—which includes these OIG materials—"would reveal the nature of the preliminary recommendations," would chill internal agency deliberations, and "mislead or confuse the public by disclosing rationales that were not the basis for the Agency's final decisions." *Id.* ¶ 13.

The CIA has provided "specific explanations for how releasing this withheld information would harm future open discussions." *Energy Pol'y Advocs. v. SEC*, No. 23-cv-507, 2024 WL 4512386, at *8 (D.D.C. Oct. 17, 2024). The D.C. Circuit has "long recognized that the risk of public confusion has a special force with respect to disclosures of agency positions or reasoning concerning proposed policies." *Reps. Comm.*, 567 F. Supp. 3d at 122; *see Citizens for Resp. & Ethics in Wash. v. Gen. Servs. Admin.*, No. 18-cv-2071, 2021 WL 1177797, at *11 (D.D.C. Mar. 29, 2021) (accepting agency's claim that release of draft OIG report would "lead to confusion regarding [the agency's] position on the investigation and . . . undermine the deliberative nature of OIG's work"). And while documents 1 and 7 were not themselves drafts, the *Vaughn* indices for both documents note that the redactions relate to recommendations about decisions relating to detainee detention which were "in the deliberation phase" by the CIA and were "provided to form a final policy," supporting the Agency's claim that the release of the redacted portions would lead

39

to confusion about the Agency's position and undermine candid discussion regarding the subjects of the reports. ECF 25-1 at 20, 23; *see also Am. Fed'n of Gov't Emps., AFL-CIO v. Dep't of Army*, 441 F. Supp. 1308, 1311 (D.D.C. 1977) (allowing the withholding of predecisional Army OIG report that was "prepared for the review of the Commander, who was the final decisionmaking authority in regard to the matters investigated," because "full disclosure of this and future Inspector General [r]eports . . . will deny investigating officers the confidentiality necessary to ensure their candid and comprehensive expression of opinions, conclusions, and recommendations").

Plaintiffs object that the CIA's claim of foreseeable harm is undercut by the fact that the CIA OIG is obligated by statute to provide reports to Congress regarding various subjects, including "particularly serious or flagrant problems, abuses, or deficiencies relating to the administration of programs or operations." 50 U.S.C. § 3517(d)(2). In Plaintiffs' view, that statutory requirement "represent[s] a congressional determination that secrecy is not necessary" to ensure that the OIG can "mak[e] candid recommendations." ECF 34 at 8. But release of an OIG report to the SSCI is not necessarily the same as release to the general public through a FOIA request. For one, Plaintiffs have not presented evidence or authority which shows that the production of these kinds of OIG reports to Congress does not come with similar redactions to those made when producing the report via FOIA. And even if the reports are produced to the SSCI unredacted, the disclosure of documents to Congress does not necessarily result in waiver of the "privileges and exemptions . . . under the FOIA with respect to the public at large." *Murphy v. Dep't of Army*, 613 F.2d 1151, 1156 (D.C. Cir. 1979).[15] Thus the release of certain OIG reports to Congress does not undermine the CIA's concerns about foreseeable harm.

---

[15] Nor do the OIG reports appear to be "documents created specifically to assist Congress," in which case they might not "enjoy Exemption 5 protection." *Rockwell Int'l Corp. v. U.S. Dep't of Just.*, 235 F.3d 598, 604 (D.C. Cir. 2001).

Accordingly, the CIA has justified withholding document 12 and redacting the relevant portions of documents 1 and 7 under Exemption 5.

## 2. *Attorney-Client Privilege*

The CIA has also withheld or redacted documents 1, 7, 8, 24, 27, 28, 30, and 61 on attorney-client privilege grounds.[16] *See* ECF 25-1 at 15.

This privilege "protects confidential communications from client to attorney, and from attorney to client." *Pub. Emps. for Env't Resp. v. EPA*, 211 F. Supp. 3d 227, 230–31 (D.D.C. 2016). In the context of an agency like the CIA, "the 'client' may be the agency and the attorney may be an agency lawyer." *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997). But the privilege only covers those communications "made for the purpose of securing legal advice or services" and those that "rest on confidential information obtained from the client." *Id.* It is the CIA's burden "to present to the court sufficient facts to establish . . . with reasonable certainty that the lawyer's communication rested in significant and inseparable part on the client's confidential disclosure." *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984).

Plaintiffs argue that the CIA has generally failed to meet the standard for withholding under the attorney-client privilege, and objects specifically to the withholdings and redactions of 7, 8, and 61. Plaintiffs do not make any specific objections to documents 1, 27, 28, and 30. But given that it is the agency's burden to prove the applicability of an exemption, the Court has reviewed the record as to all of the documents in this set. *ACLU*, 628 F.3d at 619.

---

Rather, they are "memoranda and correspondence created as part of the [Agency's] deliberative processes—precisely the kind of inter-and intra-agency memoranda Exemption 5 protects." *Id.*

[16] The CIA has also sought to withhold or redact documents 2, 10, 11, and 52 on attorney-client privilege grounds. *See* ECF 25-1 at 15. However, the Court has found that these documents are properly subject to withholding on other grounds, and therefore need not address the applicability of the attorney-client privilege. *See, e.g.*, *Jud. Watch, Inc. v. U.S. Dep't of Just.*, 20 F. Supp. 3d 260, 276 (D.D.C. 2014).

The Court finds that the attorney-client privilege has been properly invoked over documents 8, 24, 28, and 30. Document 30 is described by the CIA's declarant as a letter from the CIA to "Dan Levin, Acting Assistant Attorney General" at the Department of Justice's Office of Legal Counsel (OLC), providing background on various detainees to be used "in preparation for a future request for a legal opinion" regarding their interrogation. ECF 25-1 at 14.[17] This qualifies as a communication between the client agency and its lawyers regarding "securing legal advice or services" and was premised on confidential information provided by the CIA to OLC. *Hunton & Williams LLP*, 248 F. Supp. 3d at 253; *see N.Y. Times Co. v. U.S. Dep't of Just.*, 282 F. Supp. 3d 234, 239 (D.D.C. 2017) (finding that attorney-client privilege applied to communications facilitating an agency "s[eeking] and ultimately receiv[ing] OLC's legal advice regarding its proposed activities" because the agency was "a client of the Department of Justice"). Similarly, document 8 has been properly withheld pursuant to the attorney-client privilege. The document contains a memorandum sent by John Rizzo, who was the Acting General Counsel of the CIA,[18] to various other CIA officials, along with redacted communications from a redacted set of CIA officials to Rizzo. *See* ECF 26-3 at 99–107. The *Vaughn* index and redacted copy of the document indicate that the communications regarded "obtaining legal advice based on impressions, deliberations, and advice from [a] meeting with" the International Committee of the Red Cross regarding detainee treatment. *See id.*; ECF 25-1 at 23. Document 24 is also privileged. It is a

---

[17] The CIA's declarant describes this document as "[d]ocument 40," but the Court suspects this is an error, given that document 30, rather than document 40, is claimed in the same section of the declaration as subject to the attorney-client privilege. This description of "document 40" in the declaration also more accurately matches document 30 in the *Vaughn* index, which is described as a "letter to Acting Assistant AG" regarding "attorney-client communications and the author's comments to be used in preparation for a future legal opinion," ECF 25-1 at 14, 27, whereas document 40 in the index describes a memoranda for the record regarding discussions with Congress. The Court thus determines that the document described as "document 40" in the declaration is indeed document 30 in the *Vaughn* index.

[18] Both Plaintiffs and Defendant appear to agree that Rizzo served as Acting General Counsel of the CIA at the time. *See* ECF 26 at 12; ECF 29 at 11.

document "prepared by" an "OGC attorney,"[19] and the *Vaughn* index indicates that it was a "legal appendix," which incorporated "legal analysis and client communications." ECF 25-1 at 15, 27. The Court finds this level of detail regarding these documents and the involvement of agency attorneys in providing legal advice and analysis sufficient to uphold the privilege. Finally, document 28 has also been properly withheld in full, given that this document is a "memorandum from the [CIA's] General Counsel providing comments and recommendations to OIG regarding" a "draft version of the OIG's" Special Review on the Counterterrorism and Detention Program. ECF 25-1 at 11; *see also id.* at 27.

On the other hand, the CIA does not provide sufficient information to determine whether the attorney-client privilege applies to documents 1, 7, and 27. The CIA seeks to redact a section of document 1—specifically, page 43—to "protect legal advice pursuant to the attorney-client privilege," ECF 25-1 at 20, which the Court views as a separate redaction than the deliberative process redactions discussed and upheld above. *See supra* Section III.B.1.(f). It is not obvious to the Court that this section of the report was, as the CIA claims, a "communication[] between Agency employees and attorneys within the CIA . . . made for the purpose of obtaining legal advice." ECF 25-1 at 13–14. Review of the redacted page 43 shows an Exemption 5 redaction appearing after a mention of legal advice that was at one point given to CIA interrogators by "CTC/Legal." ECF 26-3 at 35. But it is not clear that this information was included in the OIG report in order to seek advice "on the legal ramifications of its actions." *Vento v. IRS*, 714 F. Supp. 2d 137, 151 (D.D.C. 2010). Rather, as the description in the *Vaughn* index states, this section of the OIG report appears to discuss advice given by agency attorneys previously to interrogators.

---

[19] While this description of document 24 (also describing documents 6, 52, and 61) is drawn from the section of the CIA's declaration discussing the work product privilege, the Court finds this description relevant to the applicability of the attorney-client privilege to document 24.

*See* ECF 25-1 at 20 (noting that the redaction was made to "protect legal advice"). It is true that in some contexts, "communications among employees of a client are still afforded the protection of the privilege, so long as the communications concern legal advice sought or received that was intended to be confidential." *FTC v. Boehringer Ingelheim Pharms., Inc.*, 286 F.R.D. 101, 111 (D.D.C. 2012), *aff'd in part, vacated on other grounds, and remanded*, 778 F.3d 142 (D.C. Cir. 2015); *see also Alexander v. FBI*, 186 F.R.D. 154, 161 (D.D.C. 1999) (finding attorney-client privilege applicable to client's date book entries, "which reflect conversations between the client and the attorney," when they "describe communications from attorneys or are based on such communications"). However, it is not clear that the redaction on page 43 contains such material. For example, the unredacted part of the page appears to share legal advice from CIA attorneys, along with the confidential factual material underlying that advice, without any redaction. ECF 26-3 at 35 (describing activities during interrogation and stating that "CTC/Legal had advised that threats are permissible so long as they are 'conditional'"). The Court needs more detail regarding the context and content of the redacted portions of the document to determine whether previously-relayed legal advice embedded and subsequently discussed in the OIG report qualifies under the attorney-client privilege.

The same is true for the portions of document 7 which the CIA purports to redact under the attorney-client privilege. Document 7 is the OIG's report regarding the death of detainee Gul Rahman in CIA custody. As for the portions of page 16 which the *Vaughn* index claims are withheld "based on the attorney-client privilege," the Court cannot determine the applicability of the privilege without more detail. ECF 25-1 at 23. As Plaintiffs note, this section of the document is prefaced by a statement that, among other offices, the Office of General Counsel "disseminated policy guidance, via cables, email, or orally, . . . to address requests to use specific interrogation

techniques." ECF 31-1 at 5. But a "government attorney's advice on political, strategic, or *policy issues* is not shielded from disclosure by the attorney-client privilege." *Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 926 F. Supp. 2d 121, 146 (D.D.C. 2013) (emphasis added). Further, the document's table of contents describes the relevant subject of the report as describing the "Policy for Custodial Interrogations at the time of Rahman's Death," which indicates, at least without any more detail in the *Vaughn* index to the contrary, that this section involved policy directions from counsel, rather than legal advice. ECF 31-1 at 3.

As for documents 27 and 61, there are even fewer details in the *Vaughn* index and declarations. Document 27, which was withheld in full, is described as a "draft document requesting comments/edits pursuant to attorney-client privilege," which provides almost none of the information necessary to know whether the privilege applies, such as to whom the document was sent (i.e., to or from attorneys). ECF 25-1 at 27. While the CIA's declarant broadly states that all the documents withheld for attorney-client privilege reasons were made "between Agency employees and attorneys within the CIA on issues related to the former detention and interrogation program . . . for the purpose of obtaining legal advice," *id.* at 13–14, this categorical statement does not provide any insight into this specific document which would allow the Court to properly evaluate the invocation of the privilege, *see Bloche v. Dep't of Def.*, 279 F. Supp. 3d 68, 88 (D.D.C. 2017) (rejecting more detailed description of documents on the ground that the defendant's description "insufficiently invoke[d] the attorney-client privilege," including that the document "fail[ed] to describe with any particularity . . . the purpose for which the clients sought the attorney's advice"). The same goes for document 61, which is described merely as an email which was withheld in full to "protect the interagency discussion of the topic and attorney-client communications." ECF 25-1 at 33.

Finally, the CIA has demonstrated foreseeable harm as to documents 8, 24, 28, and 30. "This Circuit lacks precedent in applying the foreseeable harm requirement to attorney-client withholdings." *Am. First Legal Found. v. U.S. Dep't of Just.*, 805 F. Supp. 3d 187, 214 (D.D.C. 2025). But the statute "unmistakably mandates that the foreseeable harm requirement extends to all privileges under FOIA Exemption 5." *Id.* That said, this Court and other courts in this jurisdiction have previously found that, given the "prominent and sacrosanct nature of the attorney-client relationship, . . . an agency may not need to provide as much information to satisfy the foreseeable harm requirement." *Wilderness Workshop v. U.S. Dep't of Agric.*, No. 21-cv-2108, 2023 WL 5672578, at *9 (D.D.C. Sep. 1, 2023); *Am. First Legal Found.*, 805 F. Supp. 3d at 214. Finally, as with the deliberative process privilege, the Court finds that it may find that the foreseeable harm requirement is satisfied—even in the absence of an agency explanation—"based on the 'context and purpose' of the withheld information." *Wilderness Workshop*, 2023 WL 5672578, at *9 (quoting *Reps. Comm.*, 3 F.4th at 372).

The CIA has met its burden with respect to these documents. First, the CIA's successful invocation of the attorney-client privilege goes "a long way" towards fulfilling the foreseeable harm requirement. *Am. First Legal Found.*, 805 F. Supp. 3d at 214. And the CIA has identified the need to protect "open communication between CIA personnel and their attorneys," and secure "full and frank legal counsel" for the Agency. ECF 25-1 at 14. This Court has previously found similarly detailed invocations of harm sufficient to meet the Government's burden and does so again here. *Friends of the River*, 2023 WL 4105168, at *8; *see also Reps. Comm.*, 567 F. Supp. 3d at 120 (finding similar harms sufficient to justify withholding under attorney-client privilege).

46

### 3. *Work Product Privilege*

The CIA's last basis for withholding under Exemption 5 is the attorney work product privilege, which applies to documents which "can fairly be said to have been prepared or obtained" by an attorney "because of the prospect of litigation." *Nat'l Ass'n of Crim. Def. Laws. v. Dep't of Just. Exec. Off. for U.S. Att'ys*, 844 F.3d 246, 251 (D.C. Cir. 2016). There is "no requirement that the anticipated litigation actually materializes." *Wilderness Workshop,* 2023 WL 5672578, at \*9. The work-product privilege protects not only factual materials prepared in anticipation of litigation, but also an attorney's "mental impressions, conclusions, opinions, or legal theories." *Tax Analysts*, 117 F.3d at 620. "[A] document can contain protected work-product material even though it serves multiple purposes, so long as the protected material was prepared because of the prospect of litigation." *United States v. Deloitte LLP*, 610 F.3d 129, 138 (D.C. Cir. 2010).

The CIA invokes the privilege over portions of documents 6 and 61.[20] *See* ECF 25-1 at 15. As to both of these documents, the CIA's declarant states that the privilege was invoked to protect material that was "prepared by an OGC attorney in reasonable anticipation of litigation," and that the withheld material consisted of "attorney notes documenting a potential litigation risk and legal considerations associated with that issue." *Id.* The Court upholds the CIA's withholdings. As for document 6, the CIA memorandum to the National Security Advisor regarding the effectiveness of the "CIA Counterterrorist Interrogation Techniques," the *Vaughn* index states that several portions of the document were redacted because they "reflect the work of an attorney in reasonable anticipation of litigation." *Id.* at 22. The document discusses, among other subjects, interrogations of specific detainees and the information gained through those interrogations. *See* ECF 26-3 at 87–90. The content of the document—the treatment and interrogation of specific detainees—is

---

[20] The CIA also invokes the work product privilege over documents 24 and 52, but the Court has determined that these are subject to withholding on other grounds.

consistent with the statement in the in the *Vaughn* index that the work product redactions of document 6 regarded "a potential litigation risk and legal considerations" regarding the interrogation program. ECF 25-1 at 15. And indeed, the interrogation program has proven to be deeply controversial and spawned years of litigation. *See, e.g.*, *Zubaydah*, 595 U.S. at 198–99 (discussing litigation by detainee Abu Zubaydah in United States and other countries regarding his detention). Plaintiffs argue that because the memorandum is titled as sent from the Director of the CIA, and the memorandum contains unredacted, factual material regarding the effectiveness of the interrogation program, the record does not support the claim that the redacted sections were made because of the prospect of litigation. ECF 26 at 33–34; ECF 31 at 34. But again, a document may contain a mixture of work product and non-work product. *See Deloitte LLP*, 610 F.3d at 138. Here, the CIA has redacted only portions of the document based on the work-product privilege, which lends credence to its claim that the document contained material prepared by OGC lawyers in anticipation of litigation. As with the attorney-client privileged documents, the CIA has also shown foreseeable harm as to the release of the work-product redacted portions of document 6. *See* ECF 25-1 at 15 (stating that "[i]f this information were to be released, it would expose the attorney's work to scrutiny and reveal preliminary litigation risk analysis and strategy"); *see also Wilderness Workshop*, 2023 WL 5672578, at *9–10 (noting that successful invocation of the work-product privilege will "go a long way" towards satisfying that burden, and also finding that context of ongoing litigation regarding the subject of the withheld materials provided grounds to find foreseeable harm).

In contrast, the Court lacks sufficient information to rule on the application of the privilege to document 61. As discussed above, the *Vaughn* index merely describes it as an email regarding a "topic" to which the attorney client and attorney work product privileges apply. ECF 25-1 at 33.

The declaration fills out some more details by stating that all the documents in this set were drafted by "an OGC attorney in reasonable anticipation of litigation." *Id.* at 15. But the record is entirely vague as to the topic of the email, or any other details that would allow the Court to evaluate "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Nat'l Sec. Couns. v. CIA*, 960 F. Supp. 2d 101, 201 (D.D.C. 2013). The mere fact that the document may have involved discussion by an agency attorney of "issues related to the former detention and interrogation program," as the CIA's declarant categorically states, does not meet the CIA's burden.[21] ECF 25-1 at 13–14. The record provides few details as to what parts of the RDI program the document related to, such that the Court could determine whether the attorney anticipated litigation on that topic. The Court will require more information regarding this document in order to rule on the application of this or any other privilege.

*    *    *

To summarize the holdings in this case: First, while the Court determines that the search of the RDINet database for responsive documents was largely adequate, the Court determines that it lacks sufficient detail regarding other aspects of the CIA's search—including its search of other, non-RDINet offices and its access to an unredacted version of the Executive Summary—such that it is unable to determine on this record whether the CIA's overall search was adequate under the statute. The Court will permit the CIA to address those issues by filing a more detailed declaration regarding the original search, or by conducting additional searches and providing the requisite supporting materials. *See, e.g.*, *Roseberry-Andrews v. Dep't of Homeland Sec.*, 299 F. Supp. 3d 9,

---

[21] Although this description is drawn from the section of the CIA's declaration discussing the attorney-client privilege, it describes document 61 (among others), and the Court finds this description relevant to the applicability of the work-product privilege to document 61.

34 (D.D.C. 2018) (permitting the defendant to "file a renewed motion for summary judgment . . . explaining how it conducted an adequate search—whether by conducting additional searches or providing additional information about the searches already conducted"). The Court will accordingly deny both Parties' motions for summary judgment without prejudice on that issue.

Second, the Court determines that the CIA has not provided sufficient detail to justify the withholding or specific redactions of documents 1, 7, 16–17, 21–23, 27, 31, 34, 36, 38, 40–42, 45–46, 50, 56–57, 59, 61, 63, and 64, on the ground that the CIA has not provided sufficient detail for the Court to determine either that the document is subject to a relevant privilege, or that foreseeable harm will come from the release of the documents. The Court thus denies both Parties' motions for summary judgment without prejudice with regard to the withholding of these documents. Should the CIA continue to withhold or redact these documents, the agency is required to explain clearly in a supplemental declaration and *Vaughn* index why these documents are permissibly withheld under Exemption 5 in accordance with the principles discussed in this opinion. The Court determines this to be the most appropriate way forward, "particularly since parts of the documents at issue remain classified." *Bloche v. Dep't of Def.*, 414 F. Supp. 3d 6, 60 (D.D.C. 2019). For those documents for which the Court did not reach the issue of foreseeable harm because the Court was unable to determine whether an Exemption 5 privilege applied, the CIA is encouraged to review and supplement its foreseeable harm claims with adequate specificity in light of the discussion in this opinion and governing caselaw regarding foreseeable harm. As for the remaining documents, the CIA has justified its withholdings under Exemption 5. The Court grants the CIA's motion and denies Plaintiffs' cross-motion as to these withholdings.

50

**IV.      Conclusion and Order**

For the foregoing reasons, it is hereby **ORDERED** that Defendant's motion for summary judgment, ECF 25, is **GRANTED** in part and **DENIED** in part without prejudice, and Plaintiffs' cross-motion for summary judgment, ECF 27, is **DENIED**, the denial being in part without prejudice, as follows:

Both Parties' motions are **DENIED** without prejudice as to the issue of the adequacy of the CIA's search.

Both Parties' motions are **DENIED** without prejudice as to the withholding of documents 1, 7, 16–17, 21–23, 27, 31, 34, 36, 38, 40–42, 45–46, 50, 56–57, 59, 61, 63, and 64.

Defendant's motion is **GRANTED** with respect to the withholding or redaction of all other documents at issue in the case, and Plaintiffs' motion is **DENIED** as to those documents.

**SO ORDERED.**

 

 

_____
JIA M. COBB
United States District Judge

Date: July 21, 2026